## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

JOSEPH CRAPAROTTA, an
individual**,**

      Plaintiff,

v.

SALVATORE A. CRAPAROTTA, an
individual, and SALVATORE A.
CRAPAROTTA, TRUSTEE OF THE
SALVATORE TRUST, as amended**,**

      Defendants.

Case No. _____

Hon. _____

---

## NOTICE OF REMOVAL

Defendants Salvatore A. Craparotta ("S. Craparotta") and Salvatore A. Craparotta, Trustee of the Salvatore A. Craparotta Trust ("the Trust")[1] (S. Craparotta and the Trust, collectively, "Defendants"), through their counsel, give notice that the above-captioned action is removed from the Macomb County Circuit Court to the United States District Court for the Eastern District of Michigan.  In support of removal, Defendants state as follows:

    1.    On or about July 13, 2021, Plaintiff filed a Complaint in Macomb County Circuit Court, where it was assigned Case No. 21-002454-CB.

---

[1] The Trust was incorrectly sued as "Salvatore A. Craparotta, Trustee of the Salvatore Trust."

2. On or about July 21, 2021, Defendants were served with the Complaint via certified mail.

3. Removal is timely under 28 U.S.C. § 1446(b). Defendants file this Notice of Removal within thirty (30) days of service of the Complaint setting forth the claims for relief upon which this action is based.

4. This is a civil action over which this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332.

5. **Diversity of Citizenship**. This action is between citizens of different states:

    a. **Plaintiff Is a Citizen of Michigan**. For purposes of diversity jurisdiction, a person is a citizen of the state in which he or she is domiciled. *See Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 828 (1989); *see also Kaiser v. Loomis*, 391 F.2d 1007, 1009 (6th Cir. 1968) (citizenship "is synonymous not with 'residence' but with 'domicile'"). "[D]omicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." *Mississippi Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 48 (1989). Plaintiff is domiciled in, and is a citizen of, the State of Michigan.

DYKEMA GOSSETT PLLC • 400 Renaissance Center, Detroit, MI 48243

  b. **Defendants Are Citizens of Florida.** Salvatore A. Craparotta, individually and as Trustee of the Salvatore A. Craparotta Trust, is domiciled in, and is a citizen of, the State of Florida. As such, complete diversity exists because Plaintiff is a citizen of Michigan, and Defendants are citizens of Florida.

6. **Amount in Controversy**. Pursuant to L.R. 81.1(a) and (b) and 28 U.S.C. § 1332(a), the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs:

  a. This action involves the management and control of S&J Cura Investments, LLC ("S&J Cura"), a holding company whose sole purpose is to own its 75% membership interest in Cura Resource Group, LLC ("Cura"), which is in the business of warehousing and distributing third-party dietary supplements from locations across the United States and Puerto Rico. (Compl., ¶¶ 15-16.) The Trust is a member of S&J Cura, and S. Craparotta has a proxy from all other members of S&J Cura to vote on all matters during his lifetime. (Id., ¶¶ 8-9, Ex .1 to Compl., § 6.1(b).)

  b. Brillati Development, Inc. ("Brillati") is the other member of Cura, owning a 25% membership interest. (Compl., ¶ 17.)

DYKEMA GOSSETT PLLC • 400 Renaissance Center, Detroit, MI 48243

c.   Brillati has filed a related action against S. Craparotta in Macomb County Circuit Court, where it was assigned Case No. 21-002455-CB (the "Related Action"), and which is also being removed to this Court.

d.   In the Complaint, Plaintiff claims that S. Craparotta is no longer Manager, and that S. Craparotta has breached the S&J Cura Operating Agreement by refusing to recognize that he is not the Manager and that Plaintiff is the Manager.  (Compl., ¶ 23-24, 31.)  Plaintiff seeks, among other things, a declaration that he is the sole Manager of S&J Cura.  (Compl., p. 6.)  Plaintiff also seeks monetary damages, and an award of attorneys' fees under Section 10.22 of the S&J Cura Operating Agreement.  (Id.)

e.   When the relief sought in an action involves specific performance, declaratory relief, or injunctive relief, the amount in controversy is measured by "the value of the object that is the subject matter of the action."  *Lorimer ex rel. Estate of Lorimer v. Berrelez*, 331 F. Supp. 2d 585, 591 (E.D. Mich. 2004) (citations omitted); *see also Cohn v. Petsmart*, 281 F.3d 837, 840 (9th Cir. 2002) (citing *Hunt v. Wash. State Apple Adver. Comm'n,* 432 U.S. 333, 347 (1977)) (holding "[i]n

DYKEMA GOSSETT PLLC • 400 Renaissance Center, Detroit, MI 48243

4

actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation").

f.    Upon information and belief, Plaintiff intends to use the declaration that he is sole Manager of S&J Cura to preclude Defendant from receiving compensation, the amount of which exceeds $75,000 (*see*, Ex. 1 to Compl., §§ 7.6, 7.15), and to trigger a partial redemption of S&J Cura's membership interest in Cura for an alleged purchase price of approximately $3.7M.

g.    In the Related Action, Brillati alleges that a "Triggering Event" has occurred due to Salvatore A. Craparotta's alleged "inactivity" as defined in the Cura Operating Agreement. Brillati further alleges, based on this purported "Triggering Event," that Salvatore A. Craparotta is required to resign as Manager of Cura, that Salvatore A. Craparotta improperly received over $600,000 in compensation during this period of alleged "inactivity," that Stephen Brillati and Plaintiff are co-Managers of Cura, and that S&J Cura is required to agree to the redemption of a portion of its membership interest by Cura.

DYKEMA GOSSETT PLLC • 400 Renaissance Center, Detroit, MI 48243

Plaintiff and Brillati have calculated the alleged redemption price to be approximately $3.7M.

h.   Plaintiff signed a written consent asserting this purported "Triggering Event" in his alleged capacity as sole Manager of S&J Cura, the very issue on which he seeks a declaration in this action.

i.   Further, under Section 10.22 of the S&J Cura Operating Agreement, the prevailing party is entitled to receive from the other party all costs, damages, and expenses including attorneys' fees incurred by the prevailing party. Where a contract specifically provides for the recovery of attorneys' fees, they can be considered when determining the amount in controversy. Williamson v. Aetna Life Ins. Co., 481 F.3d 369, 376 (6th Cir. 2007) (attorneys' fees are includable when "the fees are provided for by contract or where a statute mandates or expressly allows the payment of such fees"). Here, the contractually provided-for attorneys' fees likely will exceed $75,000 in this action.

j.   Accordingly, in light of the amount of compensation at stake, the value of the partial interest in Cura that Plaintiff seeks to

DYKEMA GOSSETT PLLC • 400 Renaissance Center, Detroit, MI 48243

have redeemed using his purported authority as sole Manager of

S&J Cura, and the claim for attorneys' fees under a contractual

attorneys' fee provision, the amount in controversy exceeds the

sum or value of $75,000, exclusive of interest and costs.

7.     Venue is proper in this Court pursuant to 28 U.S.C. § 1446(b),

because this Court geographically embraces the state court in Macomb County,

Michigan, in which Plaintiff initiated this action against Defendants.

8.     Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of all

process, pleadings and orders in this action collectively are attached hereto as

Exhibit A.

9.     A Notice of Filing Notice of Removal and a copy of this Notice of

Removal will be filed in the Macomb County Circuit Court as required by 28

U.S.C. § 1446(d), and copies of the same will be served upon Plaintiff.

10.    Based upon the foregoing, Defendants are entitled to remove this

action to this Court under 28 U.S.C. § 1441, *et seq.*

WHEREFORE, Defendants give notice of the removal of this action to this

Court.

*Respectfully submitted,*

DYKEMA GOSSETT PLLC


By: /s/ *Thomas M. Schehr*
    Thomas M. Schehr (P54391)
    Andrew J. Kolozsvary (P68885)
    *Attorneys for Defendants*
    400 Renaissance Center, 37th Floor
    Detroit, MI 48243
    (313) 568-6800
    tschehr@dykema.com
    akolozsvary@dykema.com

Dated:  August 18, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 18, 2021, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, and I hereby certify that I have mailed by first class U.S. Mail, with postage fully prepaid, the same to counsel of record for Plaintiff.

DYKEMA GOSSETT PLLC

By: */s/Thomas M. Schehr*
Thomas M. Schehr (P54391)
Andrew J. Kolozsvary (P68885)
*Attorneys for Defendants*
400 Renaissance Center, 37th Floor
Detroit, MI 48243
(313) 568-6800
tschehr@dykema.com
akolozsvary@dykema.com

121813.000001
4852-3445-1190.1

9

# EXHIBIT A



# Anthony G. Forlini

## Macomb County Clerk
## Register of Deeds

Kathy Smith
Chief Deputy Clerk

TO: _____

FROM: Macomb County Clerk of the Court

RE: **2021-002454-CB** 16th Circuit Court Case Number

JUDGE: **RICHARD L. CARETTI** _____

This is to inform you that the above mentioned case is deemed an e-filing case pursuant to Administrative Order No. 2019-4. It is MANDATORY that all further filings in this matter are to be filed electronically through the court's e-filing website at:

### http:// mifile.courts.michigan.gov

Registration instructions, filing instructions, the administrative order and frequently asked questions can be found on the court's website at:

### http://circuitcourt.macombgov.org/CircuitCourt-eFilingResources

All parties must register with the court and opposing parties one e-mail address for service. Service will be provided electronically to the email address that you provide. All parties must also register an email address with the TruFiling e-filing system. Each individual is responsible for the accuracy of the registered email address.

For TrueFiling technical support, please call 1-855-959-8868, or send an email to:

### support@truefiling.com.

You are required to serve this notification on all parties when perfecting service on the Complaint. Also, if you have not previously provided your email address to our office when submitting documents for filing, it is now required that you furnish it in order for us to update our records.

If you need help in submitting your filing electronically, assistance is available in the Circuit Court I.T. Department on the 6th Floor. Computers, scanners and staff are available to assist you during normal business hours 8:00 a.m. to 12:00 p.m. and 1:30 p.m. to 4:30 p.m.

**Court Section**
40 North Main Street, 1st Floor
Mount Clemens, MI 48043
586-469-5351; Fax: 586-469-5364
macombgov.org/ClerkRoD
courtclerk@macombgov.org

**Court Section File Room**
40 North Main Street, 1st Floor
Mount Clemens, MI 48043
586-469-5199; Fax: 586-469-5365
macombgov.org/ClerkRoD
fileroom@macombgov.org

01.17.2020

| | Original - Court<br>1st copy - Defendant | | 2nd copy - Plaintiff<br>3rd copy - Return |
|---|---|---|---|

| STATE OF MICHIGAN<br>JUDICIAL DISTRICT<br>JUDICIAL CIRCUIT<br>COUNTY PROBATE | SUMMONS | CASE NO.<br>21- 002454 -CB |
|---|---|---|

**Court address**
40 N. Main Street, Mt. Clemens, MI 48043

**Court telephone no.**
(586) 469-7171

| Plaintiff's name(s), address(es), and telephone no(s). | | Defendant's name(s), address(es), and telephone no(s). |
|---|---|---|
| Joseph Craparotta | v | Salvatore A. Craparotta, Individually<br>Salvatore A. Craparotta, Trustee of the Salvatore Trust<br>44620 Van Auken Drive<br>Hartford, MI 49057 |

Plaintiff's attorney, bar no., address, and telephone no.
Mark J. Zausmer (P31721)/Jay S. Sherston (P83183)
Zausmer, P.C.
32255 Northwestern Hwy., Suite 225
Farmington Hills, MI 48334-1574
(248) 851-4111

Salvatore A. Craparotta, Individually
Salvatore A. Craparotta, Trustee of the Salvatore Trust
6082 Sunnyslope Drive
Naples, FL 34119-8624

**Instructions:** Check the items below that apply to you and provide any required information. Submit this form to the court clerk along with your complaint and, if necessary, a case inventory addendum (form MC 21). The summons section will be completed by the court clerk.

## Domestic Relations Case

☐ There are no pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

☐ There is one or more pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint. I have separately filed a completed confidential case inventory (form MC 21) listing those cases.

☐ It is unknown if there are pending or resolved cases within the jurisdiction of the family division of the circuit court involving the family or family members of the person(s) who are the subject of the complaint.

## Civil Case

☑ This is a business case in which all or part of the action includes a business or commercial dispute under MCL 600.8035.

☐ MDHHS and a contracted health plan may have a right to recover expenses in this case. I certify that notice and a copy of the complaint will be provided to MDHHS and (if applicable) the contracted health plan in accordance with MCL 400.106(4).

☐ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.

☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has

been previously filed in ☐ this court, ☐ _____ Court, where

it was given case number _____ and assigned to Judge _____

The action ☐ remains ☐ is no longer pending.

Summons section completed by court clerk.    | SUMMONS |

**NOTICE TO THE DEFENDANT:** In the name of the people of the State of Michigan you are notified:

1. You are being sued.

2. **YOU HAVE 21 DAYS** after receiving this summons and a copy of the complaint to **file a written answer with the court** and serve a copy on the other party **or take other lawful action with the court** (28 days if you were served by mail or you were served outside this state).

3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

4. If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you fully participate in court proceedings, please contact the court immediately to make arrangements.

| Issue date<br>JUL 1 3 2021 | Expiration date*<br>- OCT 1 2 2021 | Court clerk |
|---|---|---|

*This summons is invalid unless served on or before its expiration date. This document must be sealed by the seal of the court.

ANTHONY G. FORLINI

MC 01   (9/19)   **SUMMONS**                MCR 1.109(D), MCR 2.102(B), MCR 2.103, MCR 2.104, MCR 2.105

| PROOF OF SERVICE | SUMMONS |
|---|---|
| | Case No. 21- |

TO PROCESS SERVER: You are to serve the summons and complaint not later than 91 days from the date of filing or the date of expiration on the order for second summons. You must make and file your return with the court clerk. If you are unable to complete service you must return this original and all copies to the court clerk.

## CERTIFICATE / AFFIDAVIT OF SERVICE / NONSERVICE

| ☐ **OFFICER CERTIFICATE** | OR | ☐ **AFFIDAVIT OF PROCESS SERVER** |
|---|---|---|
| I certify that I am a sheriff, deputy sheriff, bailiff, appointed court officer, or attorney for a party (MCR 2.104[A][2]), and that: (notarization not required) | | Being first duly sworn, I state that I am a legally competent adult, and I am not a party or an officer of a corporate party (MCR 2.103[A]), and that: (notarization required) |

☐ I served personally a copy of the summons and complaint,
☐ I served by registered or certified mail (copy of return receipt attached) a copy of the summons and complaint,

together with _____
List all documents served with the summons and complaint

_____ on the defendant(s):

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

☐ I have personally attempted to serve the summons and complaint, together with any attachments, on the following defendant(s) and have been unable to complete service.

| Defendant's name | Complete address(es) of service | Day, date, time |
|---|---|---|
| | | |
| | | |
| | | |

I declare under the penalties of perjury that this proof of service has been examined by me and that its contents are true to the best of my information, knowledge, and belief.

| Service fee $ | Miles traveled   Fee $ | | Signature |
|---|---|---|---|
| Incorrect address fee $ | Miles traveled   Fee $ | **TOTAL FEE** $ | Name (type or print) |
| | | | Title |

Subscribed and sworn to before me on _____, _____ County, Michigan.
                                         Date

My commission expires: _____   Signature: _____
                          Date                         Deputy court clerk/Notary public

Notary public, State of Michigan, County of _____

## ACKNOWLEDGMENT OF SERVICE

I acknowledge that I have received service of the summons and complaint, together with _____
                                                                                    Attachments

_____ on _____
                                      Day, date, time

_____ on behalf of _____
Signature

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

JOSEPH CRAPAROTTA, an individual

        Plaintiff,

vs.

SALVATORE A. CRAPAROTTA, an
individual, and SALVATORE A.
CRAPAROTTA, TRUSTEE OF THE
SALVATORE TRUST, as amended

        Defendants.

_____/

Case No. 21- 002454-CB

HON. RICHARD L. CARETTI

MARK J. ZAUSMER (P31721)
JOHN S SHERSTON (P83183)
ZAUSMER, P.C.
Attorneys for Plaintiffs
32255 Northwestern Hwy., Ste. 225
Farmington Hills, MI 48334
(248) 851-4111
mzausmer@zausmer.com
JSherston@zausmer.com

_____/

**RECEIVED**

JUL 1 3 2021

ANTHONY G. FORLINI
Macomb County Clerk

Zausmer, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

*There is no other civil action between these parties or other parties arising
out of the transaction or occurrence alleged in this complaint.*

*This case involves a business or commercial dispute as defined in MCL 600.8031 and
meets the statutory requirements to be assigned to the business court.*

## COMPLAINT

NOW COMES Plaintiff Joseph Craparotta, by and through his attorneys Zausmer, P.C.,

and for his Complaint against Defendants Salvatore A. Craparotta and Salvatore A. Craparotta,

Trustee of the Salvatore A. Craparotta Trust, as amended, states as follows:

### Parties

{03705277}

1.      Plaintiff Joseph Craparotta is a "member," within the meaning of Section 102(2)(p) of the Michigan Limited Liability Company Act (the "LLC Act") of S & J Cura Investments, LLC, a Michigan limited liability company (the "Company").

2.      The registered office of the Company is located in Madison Heights, Michigan.

3.      Defendant Salvatore A. Craparotta Trust, as amended (the "Salvatore A. Craparotta Trust"), is a grantor trust under the control of its Trustee, Defendant Salvatore A. Craparotta.

4.      The rights, preferences and privileges of the Members of the Company are governed by LLC Act and the First Amendment and Restatement of the Operating Agreement of the Company dated December 28, 2010 (the "Operating Agreement"). (Ex. 1.)

5.      The Operating Agreement is an "operating agreement," within the meaning of Section 102(2)(r) of the LLC Act.

6.      As set forth in Exhibit A to the Operating Agreement, (page 33 of 36), Plaintiff owns 33% of the authorized, issued, and outstanding "membership interests" of the Company within the meaning of Section 102(2)(q) of the LLC Act (a "Membership Interest").

7.      The Membership Interest in the Company held by Plaintiff represents a plurality of the authorized, issued, and outstanding Membership Interests of the Company; therefore, no Member of the Company holds a greater percentage Membership Interest in the Company.

8.      There are three other Members of the Company consisting of:

| | |
|---|---|
| Defendant Salvatore A. Craparotta Trust | 22.7% |
| Steve Craparotta | 22.0% |
| Anne Murphy f/k/a Anne Michaels | 22.0% |

9.      Anette Craparotta who is shown as a 22.0% Member in Exhibit A to the Operating Agreement assigned and transferred her entire 22.0% Membership Interest to Defendant Salvatore A. Craparotta Trust which is shown as a 0.70% Member in Exhibit A to the Operating Agreement,

Zausmer, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

thereby accounting for the 22.7% Membership Interest now held by the Salvatore A. Craparotta Trust. (Assignment of Membership Interest, Ex. 2.)

10.     Defendant Salvatore A. Craparotta is the father of the three other Members of the Company, i.e., Plaintiff Joseph Craparotta, Steven Craparotta and Anne Murphy.

11.     Plaintiff Joseph Craparotta is actively involved in the management and operation of the business and affairs of the Company as an executive level employee and owner.

12.     Plaintiff's siblings, Steven Craparotta and Anne Murphy, are not actively involved in the management and operation of the business and affairs of the Company and are not parties to this lawsuit.

### Jurisdiction and Venue

13.     Jurisdiction and venue are proper in the 16th Circuit Business Court because: (1) pursuant to MCL 600.8031(2)(c), Plaintiff's business dispute with Defendant involves the "internal organization" of the Company, a business entity; and (2) the business dispute arises out of "contractual agreements or other business dealings" pursuant to MCL 600.8031(2)(d).

14.     Defendant Salvatore A. Craparotta resides in Macomb County and the amount in controversy exceeds $25,000 exclusive of costs, fees, and interest.

### Factual Background

15.     The Company is an equity Member of Cura Resource Group, LLC, a Michigan limited liability company ("Cura"); i.e., the Company holds an equity Membership Interest in Cura.

16.     Cura is engaged in the business of warehousing and distributing third-party dietary supplements, from ten warehouse locations across the United States including Puerto Rico.

Zausmer, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

17. The other equity Member of Cura is Brillati Development, Inc., a Michigan corporation ("Brillati"); i.e., the sole owners of Cura are the Company and Brillati.

18. Under Article V of the Articles of Organization of the Company, which was as filed with the Michigan Department of Licensing and Regulatory Affairs on January 10, 2008, the Company is managed by its "managers" within the meaning of Section 102(2)(o) of the LLC Act (the "Managers"). (Ex. 3.)

19. Under Section 7.2 of the Operating Agreement of the Company, "Operating decisions involving the first four locations of [Cura] shall be made by [Defendant] Salvatore A. Craparotta as Manager. Operating decisions involving locations beyond the first four locations, shall be made by [Plaintiff] Joseph Craparotta." (Ex. 1, Section 7.2.)

20. Under Section 7.2 of the Operating Agreement of the Company, "Upon the death of Salvatore A. Craparotta or upon him reaching age 75, [Plaintiff] Joseph Craparotta shall be the sole Manager, if he is still active in the Company." *Id.*

21. Defendant is 76 years old; he turned 75 on April 14th, 2020.

22. Plaintiff Joseph Craparotta is still active in the Company.

23. By operation of Section 7.2 of the Operating Agreement of the Company, Plaintiff Joseph Craparotta is the sole Manager of the Company without further action or notice.

24. On June 28, 2021, by letter from legal counsel to Plaintiff to legal counsel to Defendants, Plaintiff informed Defendants that "Joseph Craparotta shall be the sole Manager" in accordance with and by operation of Section 7.2 of the Operating Agreement of the Company. (Ex. 4.)

25. On June 30, 2021, by email from legal counsel to Defendants to legal counsel to Plaintiff, Defendants stated that "we do not recognize joe [Plaintiff] as mgr." (Ex. 5.)

Zausmer, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

26.     Section 10.22 of the Operating Agreement provides that "In the event of any controversy, claim or action being made, filed or instituted between the parties to this Agreement or any of the other documents related hereto or arising from the breach of any provision hereof, the prevailing party will be entitled to receive from the other party all costs, damages and expenses including attorney fees incurred by the prevailing party whether or not such controversy or claim is litigated or prosecuted to judgment." (Ex. 1, Section 10.22.)

## COUNT I – BREACH OF CONTRACT

27.     Under Section 102(2)(r) of the LLC Act, the Operating Agreement dated December 28, 2010 is a written agreement among the Members including Plaintiff and Defendants.

28.     Pursuant to the Operating Agreement, Defendant is the Manager of the Company until his death or until "reaching age 75" and, upon either such event, "Joseph Craparotta shall be the sole Manager, if he is still active in the Company."

29.     Defendant Salvatore A. Craparotta is 76 years old and Plaintiff Joseph Craparotta is still active in the Company.

30.     Defendant Salvatore A. Craparotta no longer holds the position of Manager of the Company.

31.     Defendant Salvatore A. Craparotta has breached the Agreement because he has refused to recognize that he is not the Manager of the Company and that Plaintiff Joseph Craparotta is the Manager of the Company.

32.     Defendant Salvatore A. Craparotta is continuing to seek to exercise the power and authority of the Manager under Section 7.4 of the Operating Agreement of the Company although he is not permitted to do so, to the detriment of Plaintiff Joseph Craparotta who is a Member and the rightful Manager of the Company.

Zausmer, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

## RELIEF REQUESTED

WHEREFORE, Plaintiff requests:

(i)     an award of interest, costs, and attorneys' fees pursuant to paragraph 10.22 of the Operating Agreement;

(ii)    declaratory judgment stating that Joseph Craparotta is the sole Manager of the Company;

(iii)   declaratory judgment stating that Salvatore A. Craparotta is not a Manager of the Company;

(iv)    entry of a monetary judgment against Salvatore A. Craparotta in favor of Joseph Craparotta in whatever amount he is found to be entitled; and

(v)     and any other relief the Court deems appropriate.

Respectfully submitted,

ZAUSMER, P.C.

MARK J. ZAUSMER (P31721)
JOHN S SHERSTON (P83183)
Attorneys for Plaintiff
32255 Northwestern Hwy., Ste. 225
Farmington Hills, MI 48334
(248) 851-4111
mzausmer@zausmer.com
JSherston@zausmer.com

Dated: July 13, 2021

Zausmer, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

{03705277}                                    6

# EXHIBIT 1

RECEIVED

JUL 1 3 2021

ANTHONY G. FORLINI
Macomb County Clerk

{01938860}

*From 12/29/10 SIGNED*

# FIRST AMENDMENT AND RESTATEMENT OF THE
## OPERATING AGREEMENT
### FOR
### S&J CURA INVESTMENTS, LLC

### A Michigan Limited Liability Company

This First Amendment and Restatement of the Operating Agreement for S&J Cura Investments, LLC, (the " First Amendment and Restatement") is effective the  28th Day of December 2010 by the Manager(s) and Members (individually, a "Member" and collectively, the "Members")of the S&J Cura Investments, LLC, a Michigan limited liability company (the "Company") who Agree as follows:

## RECITALS

A.     As of December 31, 2007, the Manager(s) and Members made and entered into an Operating Agreement ("the Operating Agreement") of the Company.

B.     The Manager(s) and Members now wish to make changes to the Operating Agreement.  Therefore, the Members and Manager(s) hereby agree to the Amendment and Restatement which shall govern their relationship and in consideration of their mutual promises, covenants and agreements the sufficiency of which is acknowledged and who hereby promise, covenant and agree as follows:

## ARTICLE I

## ORGANIZATION

**1.1    Formation.**  The Company has been organized as a Michigan limited liability company under and pursuant to the Michigan Limited Liability Company Act, 1993 PA 23, as amended from time to time, (the "Act") by the filing of Articles of Organization ("Articles") with the Department of Consumer and Industry Services of the State of Michigan as required by the Act. The rights and liabilities of the Members and definitions of terms to the extent not defined here in fully, shall be determined pursuant to the Act, and Articles, the Internal Revenue Code as amended from time to time ("Code") and this Agreement. It is the expressed intention of the Members that this Operating Agreement shall be the sole source of the agreement of the parties, and, except to the extent a provision of the Operating Agreement expressly references federal tax rules by reference to a section of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Operating Agreement shall govern, even if inconsistent with, or different than any provision of the Act or any other law or rule to the extent permitted.  To the extent any provision of the Operating Agreement is prohibited or ineffective under the Act or the Code, this Operating Agreement shall be considered amended to the smallest degree possible in order to make the Agreement effective. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

**1.2    Name.** The name of the Company is S&J Cura Investments, LLC. The Company may also conduct its business under one or more assumed names, as the Manager(s) deem(s) appropriate in their sole discretion.

**1.3    Purpose.** The purpose of the Company is to invest in Cura Resource Group, LLC, and any related purchase, management and disposition of real and personal property. The Company shall have all the powers necessary or convenient to affect the purpose for which it is formed, including all powers granted by the Act.

**1.4    Duration.** The Company shall continue in existence in perpetuity until the Company dissolves and its affairs are would up in accordance with the Act or until a Sale (as defined in Section 9.2).

**1.5    Registered Office and Resident Agent.** The Registered Office and Resident Agent of the Company shall be as designated in the initial or amended Articles. The Registered Office or Resident Agent may be changed from time to time by the Manager. Any such change shall be made in accordance with the Act. If the Resident Agent resigns, the Manager(s)shall promptly appoint a successor.

**1.6    Intention.** The Members, as defined in Section 102(I) of the Act, intend and agree that the Company is a limited liability company and is not a partnership or other form of venture. No Member shall be construed to be a partner in the Company or of any Member, Manager or person. For federal and state income tax purposes only, the Company shall elect to be taxed as a partnership pursuant to subchapter "K" of the Code.

**1.7    Succession.** If a Manager dies, becomes bankrupt, withdraws or is removed, the successor Manager shall be appointed as provided herein.

## ARTICLE II

## BOOKS, RECORDS AND ACCOUNTING

**2.1    Books and Records.** The Company shall maintain complete and accurate books and records of the Company's business and affairs as required by the Act and such books and records shall be kept at the Company's Business Office and shall include but not be limited to: (a) a current list of Members' and Managers' names and addresses, (b) a copy of the Articles, together with any adjustments, (c) copies of the last three (3) years tax returns and books of account, (d) copy of the Operating Agreement and all Amendments, (e) records, including minutes evidencing authorization of Company action, (f) copies of records that would enable a Member to determine the relative share of distributions and voting rights, (g) copies of any Powers of Attorney, (h) copies of significant contracts  The Company upon a reasonable written request shall provide a Member access to book and records for inspection during business hours or at the Members expense copies of such books and records so long as reasonable and subject to reasonable use restrictions sell as protective orders to prevent competitive use of confidential information.

2

**2.2.    Fiscal Year; Accounting.**  The Company's fiscal year shall be the calendar year. The particular accounting methods and principles to be followed by the Company shall be the accrual basis for financial reporting purposes and for tax reporting purposes any method as permitted by the Code.

**2.3    Reports.**  The Manager(s)with the assistance of the Members shall provide reports concerning the financial condition and results of operation of the Company and the Capital Accounts of the Members to the Members in the time, manner and form as the Manager(s) determine(s).  Such reports shall be provided at least annually as soon as practicable after the end of each year and shall include a statement of each Member's shares of profits and other items of income, gain, loss, deduction and credit.  The Manager(s) shall cause income tax returns to be prepared and filed with the appropriate authorities.  A Member is not entitled to rely on the reports if the Member has actual knowledge that makes the reliance unwarranted.

**2.4    Member's Accounts.**  The Company shall maintain separate Capital Accounts for each Member in accordance with Regulation 1.704-1(b) and all provisions regarding the establishment and a maintenance of capital accounts shall be interpreted and applied to comply with the Treasury Regulation.  Each Member's Capital Account shall reflect the Member's capital contributions (at fair market value with respect to any contributed property) and increases for the Member's share of any net income or gain of the Company.  Each Member's Capital Account shall also reflect decreases for distributions (at fair market value) made to the Member and the Member's share of any of the Company's losses and deductions and any expenditures under Code section 705(a)(2)(b).  The Members' accounts shall reflect all adjustments as required by Section 704 of the Code and related sections and appropriate Regulations.  If any or all portion of a Member's interest is transferred in accordance with this Operating Agreement, then the transferee shall succeed to the Capital Account of the transferring Member, so transferred.

**2.5    Section 754 Election.**  In the event of a distribution of property made in a manner provided in Section 734 of the Code, or in the event of a transfer of any Member interest permitted by this Agreement made in the manner provided in Section 743 of the Code, the Manager, on behalf of the Company, may, but shall not be required to file an election under Section 754 of the Code in accordance with the procedures in the applicable Regulations.  Such adjustments shall accounted for separately and not affect cash distribution or Member accounts described in Section 2.4

**2.6    Bank Accounts.**  The Company funds shall be deposited in such bank account or accounts as designated by the Manager.  The Company securities and intangible investments shall be deposited in a brokerage account or safe deposit box as designated by the Manager.

**2.7    Company Property.**  Real and personal property owned or purchased by the Company shall be held and owned in the Company's name.  No Member shall have any interest, right or claim to any of the Company assets.

3

**2.8    Reserves.** The Manager(s) shall establish reserves for working capital to pay taxes, insurance, debt service, repairs, replacements or liabilities or other costs and expenses incident to the ownership or operation of the Company and for such other purposes as the Manager(s)may from time to time deem appropriate.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

**3.1    Initial Commitments and Contributions.** In exchange for the Membership interest in the Company and by the execution of this Operating Agreement, the initial Members hereby agree to make the capital contributions (money or fair market value of property) set forth in the attached Exhibit A. The Members' interest in the total capital of the Company (the Members' "Sharing Ratios," as adjusted from time to time to reflect changes in the Capital Accounts for the Members and the total capital in the Company) are also set forth in Exhibit A. Any additional Member (other than an assignee of a membership interest who has been admitted as a Member) shall make the capital contribution set forth in an Admission Agreement. No interest shall accrue on any capital contribution and no Member shall have any right to withdraw or to be repaid any capital contribution except as provided in this Operating Agreement. It is the intent of the Members that no distributions shall be a return or withdrawal of capital even if the distribution is effected by a non cash item such as depreciation.

"Capital Account" means a separate account maintained for each Member in accordance with the provisions of the Agreement and the Code. Each Members capital account shall reflect the Members capital contribution and increases for the Members share of any met income or gain. Each Member's capital account shall also reflect decreases for distributions made to the Member and the Members share of losses and deductions. In the event all or a portion of an interest is transferred pursuant to this Agreement, the transferee shall succeed to the capital account to the extent transferred.

**3.2    Additional Contribution.** In addition to the initial capital contributions, the Manager(s)may with the consent of 80% of the Sharing Ratios, determine from time to time that additional capital contributions are needed to enable the Company to conduct its business and affairs. After making such a determination, notice of it shall be given to all Members in writing at least ten (10) business days before the date of which the additional contributions are due. The notice shall describe, in reasonable detail, the purposes and uses of such additional capital, the amounts of additional capital required, and the date by which payment of the additional capital is due. Any Member has the right, but not the obligation to make the additional capital contributions needed according to that Member's Sharing Ratio. Failure to make additional capital contributions shall reduce that Member's Sharing Ratio and rights in the future. If the Members failure to contribute additional capital to the Company would result in the Company's insolvency, Company's default under any existing credit facilities, or foreclosure or written threatened foreclosure of any of the Company's real or personal property in the reasonable opinion of the Manager(s), the Manager(s) shall not need Members approval. The additional contribution shall be based on each Member's prorata interest in the Company. The amount of the forfeiture is

determined by multiplying that percentage of the additional capital contribution which is not paid by the Member to the Company by the shares of the Company then owned by such Member. In the event of such forfeiture, the Member shall have no further membership rights in the Company with respect to such shares. The obligations to make additional contributions shall only for enforceable by the Members and not by creditors of any Member or any third party.

**3.3 Capital Contribution Loans by the Manager.** If any Member elects not to contribute his or her portion of any capital contribution determined by the Manager(s)to be needed by the Company, the Manager(s)may loan such amount. The Manager(s) shall be entitled to treat these amounts as an extension of credit to such non-contributing Member, payable out of any distributions which would otherwise be made to such non-contributing Member, with interest accruing on the loan at the rate of prime rate plus 1% per annum until paid, but no less than the rate equal to 120% of the applicable federal rate for short-term debt for the month the loan was made.

**3.4 Loans by the Members.** If the guarantee of the Members is required in connection with any financing provided to or for the benefit of the Company, each Member will furnish a guarantee with the amount equal to such Member's Sharing Ratio multiplied by the amount of the financing upon request and in the form requested by the Company. Upon the acceleration of any loans to the Company, then if a Member has executed a separate written guarantee such Member shall be liable for his prorata share based upon Sharing Ratios of any obligations, liabilities, judgments, causes of action, costs or expenses, including attorney fees incurred by any Member/Guarantor in connection with any failure or inability of the Company to discharge its indebtedness which was guaranteed by a Member. Each Members' obligation to pay such prorata share shall be based upon the respective Sharing Ratios and shall survive dissolutions or termination of this Agreement. If any Member pays more than such Member's prorata share, then the other Members who have executed a separate written guarantee agree to indemnify that Member for the amount in excess of such Members prorata share based upon a portion of the Nonpaying Member's prorata Sharing Ratios. Any Member may make or cause a loan to be made to the Company in any amount for business purposes. Such loans shall be on commercial terms with interest accruing at 7% per annum compounding until paid, but no less than 100% of the applicable federal rate for short-term debt for the month the loan was made. The amount of such loan shall not be treated as a contribution to capital, but shall be a debt due from the Company. While outstanding, distributions to Members shall be suspended except for taxes, as provided herein.

**3.5 Company Capital.** All Company assets will be owned by the Company and shall be in the Company name. No Member shall have any ownership interest in such property. Each Member expressly waives the right to require Company distribution of any of the Company assets or have a right of partition of any property owned by the Company. Each Member's interest shall be personal property for all purposes.

**3.6 Third Party Rights.** Nothing contained herein is intended for the benefit of any creditor or other person (other than a Member in his capacity as such) to whom the Company owes any debts, liabilities, or obligations or who otherwise has any claim against the Company, and no third party shall have any rights by virtue of the provisions herein.

**3.7     Non-Cash Capital Contributions.** In the case of a capital contribution of non-cash property to the Company by any Member, all items of income, gain, loss, deductions and credits with respect to such contributed property, as determined from federal income tax purposes, shall be allocated among the Members to the extent necessary to take into account the difference between the fair market value (asset value) and adjusted income tax basis of the property at the time of the contribution. Such allocation shall be made in a manner prescribed by Section 704(c) of the Code and the Regulations promulgated thereunder.

## ARTICLE IV

## ALLOCATIONS AND DISTRIBUTIONS

**4.1     Allocations.** The Company shall elect to be treated as a partnership for tax purposes under the Code. Except as may be required by the Code as amended or this Operating Agreement, the Company's net profits, net losses, and other items of income, gain, loss, deduction and credit shall be allocated among the Members in accordance with each Member's Sharing Ratio using any permissible method. All profits, losses and other items and distributions shall be credited or charged, as the case may be to their Capital Accounts. Code Sections 704 and 706 and related Regulations, as issued and amended shall be followed. To the extent this Agreement is silent or in conflict with the Regulations, the Regulations shall control. The Members hereby agree to be bound by the provisions of this Article IV in reporting their share of Company income and loss for income tax purposes and shall report their items consistent with the treatment of such items on the Company Tax Returns.

Should a Member's Capital Account fall below zero, for tax purposes only, all losses shall be allocated to Members with a positive Capital Account and in accordance with Sharing Ratios if more than one Member has a positive Capital Account. Such tax losses shall be restored in profitable years to achieve the Member's Sharing Ratio. Should no Member have a positive capital account, then losses shall be allocated to the Members in accordance with their tax basis arising from Member loans to the Company. If no loans to the Company from the Members exist, then in accordance with the Member's share of non recourse debt.

All items of recapture under Code 1245, 1250 or other similar recapture items shall be allocated in proportion to each Member's actual share of the deduction, credit, etc. giving rise to such item of recapture.

In the event a Member unexpectedly receives an adjustment, allocation or distribution described in Reg. 1.704-1(b)2(ii)(d)(4), (5) or (6) which has not otherwise been taken into account in determining such Member's adjusted Capital Account deficit, if any, such Member shall be specially allocated items of income or gain in any amount and in such manner sufficient to eliminate, to the extent required by the Treasury Regulations under Code Sec. 704., such default as quickly as possible but only to the extent such Member does not have an obligation to restore such Member's Capital Account default. This paragraph is interpreted to

6

constitute a "qualified income offset" under Treas. Reg. 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

Notwithstanding anything to the contrary, if during a fiscal year there is a net decrease in Company minimum gain as defined in Treas. Reg. 1.704-2(d), each Member shall be allocated items of income and gain for such year and if necessary, subsequent years in an amount equal to the greater of (1) the portion of such Member's share of the net decrease in minimum gain for the year, as determined in accordance with Treas. Reg. 1.704-2(f) that is allocable to the disposition of property subject to one or more non-recourse liabilities or (2) if such Member would otherwise have an adjusted Capital Account deficit, an amount sufficient to eliminate such deficit. This paragraph is intended to comply with the minimum gain chargeback provisions under Reg. 1.704-2(f) and should be interpreted and applied consistently therewith.

To the extent and in the manner provided by Treas. Reg. 1.704-2(i)4, if there is a net decrease in Member minimum gain, each Member with a share of Member minimum gains shall be allocated items of Company income and gain for such year and if necessary, subsequent years in an amount equal to the share of each Member in the net decrease in Member minimum gain. The items to be allocated shall be determined in accordance with Treas. Reg. 1.704-2(i)(4), (j)2. This section is intended to comply with the minimum-gain chargeback requirement of Treasury Reg. 1.704-2(i)4 and shall be interpreted consistently with it.

Any Company non-recourse deductions shall be allocated amongst the Members in accordance with Treas. Reg. 1.704-2(e).

Member non-recourse deductions shall be allocated to the Members who bear the risk of loss with respect to Member non-recourse debt to which Member non-recourse deductions are attributable in accordance with Treas. Reg. 1.704-2(i)(l).

Items of income, gain, loss and deduction with respect to any property contributed by a Member in the Company shall, solely for tax purposes be allocated amongst the Member in a way that takes into account of any variation between the adjusted basis of such property to the Company and its value for Capital Account purposes in accordance with Section 704(c) of the Code, as amended and the regulations thereunder.

Any income, gain, loss or deduction realized as a direct result or indirect result of the issuance of any interest by the Company to a Member shall be allocated amongst the Members so that, to the extent possible, the net amount together with all other allocations under this Agreement to each Member share equal to the net amount that would have been allocated to each Member if the items had not be realized.

In the event that a guaranteed payment to a Member or other payment is recharacterized for federal income tax purposes and the effect of disallowing the payment is a deduction or reduced basis in an asset, then an amount of Company gross income equal to such payment shall be allocated to the recipient of such payment. In the event that the

recharacterization results in a deduction, such deduction shall be allocated to the recipient of the deduction.

The Manager(s) is (are) authorized to allocate income and loss amounts to Members so as to prevent regulating allocations from distorting Company Sharing Ratios and distributions. This will be accomplished by allocations so that the net amount of regulatory allocations to each Member is zero. The Members are aware of the tax consequences of the allocations and their related economic impact and hereby agree to be bound by the provision of this Article in reporting their share of income and loss for income tax purposes.

The allocation method set forth is intended to allocate income (loss) to the Members in accordance with their actual economic interests while complying with the requirement of Code Section 704 and the Regulations promulgated thereunder. If in the opinion of the Manager, the allocations pursuant to the preceding provisions of this Article shall not satisfy the Internal Revenue Code or Regulations or account for any expenditure or transfer of an interest, then, not withstanding anything to the contrary, profits and losses shall be allocated in such a manner as the Manager(s) in its(their) reasonable and informed discretion, determines to be required so as to reflect items as the case may be and the Manager(s)shall have a right to amend this Agreement without action of the Members to properly reflect items provided. It shall not materially alter the economic agreement of the Members.

Each Member shall reflect on their income tax returns all items in a manner consistent with the treatment of such items on Company tax returns and consent to all elections made in good faith by the tax matters partner.

**4.2.1   Distributions.** The Manager(s)may make distributions to the Members from time to time in his sole and absolute discretion, provided that such distributions are in compliance with their fiduciary obligations to the Members or do not violate any creditor agreement of the Company or provision of the Act. Distributions shall mean a transfer of property or money by the Company to its Members without consideration. Distributions may be made only after the Manager(s) determine(s) in their reasonable judgment, that the Company has cash on hand exceeding the Members' loans and the Company's current and anticipated needs (including, operating expenses, debt service, acquisitions, reserves and mandatory distributions, if any). Distributions shall be made to the Members in accordance with each Member's prorata Sharing Ratios. Liquidation distributions shall be made based upon Capital Account interests. Distributions shall be in cash or property, or both, as the Manager(s) determine(s). No distribution shall be declared or made if, after giving it effect: (a) the Company would not be able to pay its debts as they become due in the usual course of business or (b) the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy on dissolution the preferential rights of other Members that are superior to the rights of the Members receiving the distribution. Non cash distributions shall be accounted for at the fair market value of the property at the time of the distribution.

A Member may withdraw his or her capital account only as expressly authorized by this instrument, which requires the permission of the Manager(s) in their sole and absolute

discretion. For a period of sixty (60) days only; immediately following any gratuitous addition to a Member's capital account, the Member whose capital account is increased (the Donee-member) shall have the right to withdraw an amount equal to the amount qualifying under IRC 2503(b). If the donor is married when the gift is made and the gift is eligible for gift splitting under Code section 2513(a), the amount qualifies shall be increased appropriately. No Member shall be forced to withdraw or resign from the Company prior to dissolution and winding up with our first obtaining the consent of the Manager(s) and all the other Members. A Member who withdraws in violation of this shall forfeit any and all distribution to which such Member shall be entitled to receive under this Act or Agreement This power can be exercised by a written request delivered to the Manager. The request may be made on behalf of a Donee-Member who is unable to exercise this withdrawal power because of a legal disability (including minority), by a legally authorized guardian or custodian or trustee. The Manager(s) shall promptly notify each Member of their rights but may withdrawal same in writing prior to any gratuitous addition.

A Member may withdraw his or her Capital Account only as expressly authorized by this instrument, which requires the permission of the Manager(s) in his(their) sole and absolute discretion. The Manager(s) shall distribute sufficient cash to fund the Members' federal and state income tax on their reportable share of cumulative taxable income from the Company at the highest individual rates, by April 1 of the following year provided the company has sufficient cash reserves as described in this Article.

**4.2.2    Tax Distribution.** Subject to the limitations contained in Section 4.2.1 above, the Manger shall distribute to the Members sufficient cash to fund each Members federal and state income tax obligation on their reportable share of the cumulative taxable income from the Company at the highest rates, by April 1 of the following year. Notwithstanding the preceding sentence if the Member is required to make estimated payments for federal income tax purposes, the Member may request that he Company, to the extent not already distributed, make distributions to such Member equal to one-fourth (¼) of the estimated annual distribution for such taxable year on the dates corresponding to the estimated tax payments.

**4.3    Unused.**

**4.4    Compensatory Partnership Interest.** In regard to any issuance of a capital interest or profits interest, the Company and of its Members agree to be bound irrevocably by the Liquidation Value Safe Harbor Regulations issued under Section 83 or appropriate partnership tax sections of the Code. The Company is authorized and directed to make the Liquidation Value Safe Harbor elections and the Company and all of its Members agree to comply with and be bound by all the requirements of the Liquidation Value Safe Harbor Regulations for all compensatory interest transfers to which it applies while the election remains in effect.

The Company and its Members agree to file their respective tax returns consistent with the Liquidation Value Safe Harbor provisions.

This election shall be effective the day before the compensatory interest is transferred.

9

**4.5 Phantom Income.** Each Member understands that taxable income and gain allocated to such Member by the Company under this Agreement and the tax on the portion there allocable to such Member hereunder for any tax year may exceed the cash distributions from the Company to such Member and such Member may have to look to sources other than distribution from the Company to pay the tax.

ARTICLE V

DISPOSITION OF MEMBERSHIP INTEREST

**5.1 General.** Every sale, assignment, transfer, exchange, gift, donation, bequest, deposit, devise, alienation, mortgage, pledge, grant, hypothecation, or other disposition, directly or indirectly, of any membership interest shall be made only in compliance with this Article. No membership interest shall be disposed of if: (a) the disposition would cause a termination of the Company under the Code; (b) the disposition would not comply with all applicable state and federal securities laws and regulations; (c) the assignee of the membership interest fails to provide the Company with the information and agreements that the Manager(s) may reasonably require in connection with such a disposition. (d) Such disposition would substantially increase administrative costs to the company or expose the company to potential liability; (f) That such disposition will result in the imposition of fiduciary responsibility on the company, manager, member of affiliate under the Employee Retirement Income and Security Act of 1974, amended from time to time; (g) That such dispositions would result in the violation of any term or agreement to which the Company is a party or (h) the disposition would result in the acceleration of any indebtedness of the Company. Any attempted disposition of a membership interest in violation of this Article is null and void and of no force or effect.

**5.2 Permitted Transfers.** Each Member shall be permitted, voluntarily, to assign all or any portion of his or her membership interest so long as they comply with Article V.

The Assignment of a membership interest does not entitle the assignee to participate in the management and affairs of the Company or become or exercise any rights of a Member. Such assignee is only entitled to receive, to the extent assigned, the distributions to which the assigning Member would otherwise be entitled.

An Assignee of a voluntary transfer may be admitted as an additional or substitute Member if all the Members approve in writing, the Assignee adopts and agrees to be bound by the operating agreement, the Assignee releases the Company, the Manager(s) and Members from any liability to the date of their assignment, and the Manager(s) approve(s)s in its(their) sole discretion and the costs of processing and perfecting an admission including reasonable attorney fees shall be borne by the Party seeking admission.

No involuntary transfer by operation of law (bankruptcy, insolvency, creditor execution, divorce) or other involuntary assignment shall convey full Member rights and privileges. That assignment of a membership interest does not entitle the assignee to participate in the management

and affairs of the Company or become or exercise any rights of a Member. Such assignee is only entitled to receive, to the extent assigned, the distributions to which the assigning Member would otherwise be entitled.

Each Member hereby acknowledges the reasonableness of the restrictions on transfer in view of the Company's purposes and the relationship of the Members. Accordingly, such restriction on transfer contained herein shall be strictly enforceable.

**5.3    Death.** Each Member expressly agrees that in the event of death, or otherwise during life, he waives on behalf of himself and his estate and directs his legal representative and beneficiaries to waive the furnishing of any inventory, accounting or appraisal of the assets of the Company and any right to any audit or examination of the books. They shall be entitled to copies of any tax returns or financial statements issued for the last three years.

**5.4    Withdrawal of Members.** No Member shall have the right to withdraw from the Company without the unanimous approval of the remaining Members prior to dissolution and wind up.

**5.5    Restrictions or Transfer.**

No Member shall, gift, bequest, assign, hypothecate, mortgage, or dispose of their Member interest (each a "transfer") or any portion thereof, except as to a permitted transferee and except as determined by this Agreement. Any Transfer not in compliance with this Agreement shall be null and void and of no force or legal effect. A permitted transferee is a Trust(s) established for the benefit of parents or siblings (provided the trustee and/or successors agree in writing to be bound by all the terms and conditions of this Agreement, (ii) another member.)

Each Member acknowledges the reasonableness of the restrictions on the transfer imposed by this Agreement in view of the Company purposes, the relationship of the Members and accepts the mandatory but out and related pricing as fair and equitable.

Accordingly, the restrictions on transfers contained here in shall be specifically enforceable. Each Member hereby further agrees to hold the Company, each Member and their agents (and each Member's successor and assigns) wholly and completely harmless form any cost, liability or damage (including without limitation liability for income taxes and costs of enforcing this indemnity.) If any Member violates this Agreement it shall identify other Members and the Company for costs incurred.

**5.6    Sale of the Company.** If when Salvatore Craparotta is Manager and in his sole discretion approves or if Members holding not less than 80% of the membership interest (Sharing Ratios) approve a sale of all or substantially all of the Company's assets or a sale of all or substantially all of the Company's membership interests (whether by merger, recapitalization, consolidation, reorganization, combination, share exchange, or otherwise) to a bona fide third party (an "Approved Sale"), each Member will vote for, consent to and raise no objections against such Approved Sale. If the Approved Sale is structured as (i) a merger, consolidation, share exchange or

11

other transaction triggering dissenter's rights, appraisal rights or similar rights under the Act or other applicable law, then each Member will waive any dissenter's rights, appraisal rights or similar rights in connection with such merger, consolidation, share exchange or other transactions, or (ii) sale of membership interests, then each Member will agree to sell all of his/her interests and rights to acquire membership interests on the terms and conditions approved by the holders of not less than 80% of the membership interest then outstanding. Each Member will take all necessary or desirable actions in connection with the consummation of the Approved Sale as requested by the Company.

The obligations of the Members with respect to an Approved Sale of the Company are subject to satisfaction of the following conditions: (i) upon the consummation of the Approved Sale, each Member will receive the same form of consideration and the same portion of the aggregate consideration that such Members would have received in such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in Section 9.3 of this Agreement; and (ii) if any Members are given an option as to the form and amount of consideration to be received, each Member will be given the same option.

Each Member will bear their prorata share (based upon their Sharing Ratio) of the costs of any sale of membership interest pursuant to an Approved Sale to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party. Costs incurred by a Member for their own individual benefit will not be considered costs of the transaction hereunder.

5.7    **Salvatore A. Craparotta Death.**  Upon the death of Salvatore A. Craparotta, Stephen Brillati or his Affiliate has an option to purchase a portion of the Cura Resource Group, LLC interests owned by S&J Cura Investments, LLC to achieve an overall ownership of 50% in Cura Resource Group, LLC, the "Brillati Option". If exercised, the sale proceeds and related gain shall be allocated prorata to the interests not owned by Joseph Craparotta in partial redemption of their interests.

If the full investment in Cura Resource Group, LLC is purchased, the gain shall be allocated prorata to all Members of the S&J Cura Investments, LLC.

Further, upon the death of Salvatore A. Craparotta, Joseph Craparotta, if still active in the Company and subject to the Brillati Option referenced in Section 5.7, shall have the option, if exercised within ninety (90) days, to purchase the remaining S&J Cura Investments, LLC interest not owned by Joseph Craparotta based upon the applicable percentage of the Members remaining after the Brillati Option is exercised. The Purchase Price shall be (5) times the average flow through profit of S&J from Cura Resource Group, LLC (gross before guaranteed payments) for the prior two (2) full years as presented on the tax returns, less a reduction for imputed management service fees of $200,000 times the applicable percentage. The Purchase Price shall be secured by the interests purchased and paid by means of a non-recourse non-negotiable promissory note (the "Note"). The sole security will be the Member's interest purchased and there will be no recourse to Joseph Craparotta for payment. The Note shall be payable over five (5) years or longer with annual payments, with interest at the minimum

12

applicable federal rate as defined in the Internal Revenue Code on the date immediately preceding the date of the exercise of this Option. The annual payment on the Note for interest and principal shall be equal to 50% of the net income applicable to the Membership Interest purchased. During this period, Joseph Craparotta would not increase his guaranteed payments for services as provided for in Section 7.15

5.8     **Unused.**

5.9     **Death of a Member Prior to Salvatore Craparotta's Death.** In the event of a death of a Member prior to Salvatore Craparotta's death their interest shall automatically be transferred to their children. In the event of no children, than the interest shall be repurchased by the remaining Members, based upon the price calculated upon the applicable prorata share of the sum of the average annual profits of the Company, S & J Cura Investments, LLC, for the preceding two (2) years multiplied by five (5) and the applicable prorata share of the book value of Cura Resource Group, LLC for the month ended before the death.

## ARTICLE VI

## MEETINGS OF MEMBERS

6.1(a)  **Voting.** All Members shall be entitled to vote on any matter submitted to a vote of the Members. The Members shall have the right to vote on all of the following: (a) the dissolution of the Company pursuant to Paragraph 9.1(c) of this Operating Agreement; (b) the merger, recapitalization, reorganization, conversion, share exchange, or interest exchange of the Company; (c) a transaction at less than fair value between a Member or Manager(s) and the Company; (d) an amendment to or restatement of the Articles of Organization or this Operating Agreement; (e) the sale, exchange, lease, or other transfer of all or substantially all of the Company's assets (except as provided in Section 5.6) and (f) a capital expenditure, acquisition of an equity interest in another business entity, borrowing, loan to a third party, assumption of debt or guarantee, indemnification in excess of $100,000; (g) appointment of a successor manager; (h) extraordinary and non usual decisions involving matters outside the ordinary course of business; (i) determining the need for additional capital contributions; (j) the sale of membership interests in lieu of sale of assets; (k) confessing of a judgment; (l) any act which would make it impossible to carry on the business of the Company; (m) any matter the Act requires expressly a vote or consent of the Members; (n) the issuance of any Membership interest to any individual or entity; (o) any appointment of a successor Manager.

6.1(b)  **Proxy Vote.** All Members hereby give their proxy to vote to Salvatore A. Craparotta on all matters during his lifetime. Upon his death this proxy shall expire.

6.2     **Required Vote.** Even if a lower percentage vote is required by the Act, the affirmative vote or consent of 80% of the Sharing Ratios of all the Members entitled to vote or consent on such matter is required on matters requiring a vote of the Members under Section 6.1 of this Agreement or otherwise. A Member with a 10% Sharing Ratio has a 10% vote, except for the

selection of an arbitration panel. Other voting requirements are provided for in their respective sections. For an example, the required vote for investment in another company or business shall be 100%.

6.3     **Meetings.** An annual meeting of Members for the transaction of such business as may properly come before the Meeting shall be held at such place, date, and time that the Manager(s) shall determine. Special meetings of Members for any proper purpose or purposes may be called at any time by the Manager(s) or the holders of at least 80% of the Sharing Ratios of all Members. The Company shall deliver or mail written notice stating the date, time, place and purpose(s) of any meeting to each Member entitled to vote at the meeting. The notice shall be given not less than ten (10) nor more than sixty (60) days before the meeting date. All meetings of Members shall be presided over by the Manager. Members holding at least 80% of all Member's interests shall constitute a quorum. Only Members present may vote. Without a quorum present, the meeting shall be adjourned and no business conducted at the meeting.

A Member and/or Manger may participate in a meeting by telephone or other communication equipment.

When any notice is required to be given to a Member, a waiver signed in writing shall be the equivalent to the giving of the notice, even if signed after the meeting.

6.4     **Consent.** Any action required or permitted to be taken at an annual or special meeting of the Members may be taken by consent without a meeting, prior notice, or a vote. The consent must be in writing, set forth the action so taken and be signed by the Members having at least the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all membership interests entitled to vote on the action were present and voted. Every written consent shall also bear the date upon which each Member signs the consent. Prompt notice of the taking of action without a meeting by less than unanimous written consent shall be given to all Members who did not consent in writing to the action. Failure to dissent to the Company action within ten (10) days shall be a waiver of such Members right to dissent.

6.5     **Deadlock.** It is the intention of the Members and Manager(s) to promote the best interest of the L.L.C. and to maintain its existence as a separate ongoing business consistent with the provisions of this Agreement. Therefore, the Members and Manager(s) shall cooperate in seeking approaches and solutions. Nevertheless, a deadlock situation may arise. As used herein, the term "deadlock" shall mean a situation of impasse where a decision that is necessary to the continuing operation of the L.L.C. and as a going business concern cannot be taken because of a failure to agree upon, by the appropriate vote. a common course of action among the Members; or the Manager(s) of the L.L.C. lacks the authority under Article VII or where the Members fail to agree by the appropriate vote on whether the L.L.C. should be dissolved. Deadlock shall not occur simply because a proposal by one Member, such as a potential customer's business or personnel retention is rejected by the others, so long as the Members or Manager(s) agree on an alternative course of action that will not result in material detriment to a Member's interest and that will assure the future ongoing existence of the L.L.C. Deadlock might occur, for example, in the event the

14

Members and Manager(s) disagree over the need of additional capital at some future date or over the prospects of the L.L.C. as a viable going business.

In the event of Deadlock that the Members or Manager(s) have not resolved during the thirty-day period after it arose, any Member may call a meeting of the Members and Manager(s) and Senior Management of the L.L.C., if any. If the Members and Manager(s) are unable to resolve the Deadlock at such meeting or otherwise during the ninety-day period after such Deadlock arose, then Salvatore A. Craparotta shall have the tie breaking vote if he is the Manager. If he is not the Manager then the Members and Manager(s) shall each pick one panelist for an arbitration panel and that panel shall pick an independent Member of the panel to be the third Member of the panel. In the event the members, by majority vote, cannot agree on a panelist, then a Court shall appoint same. The decision of the arbitration panel shall be binding on the parties and may be enforced in any court of competent jurisdiction.

6.6 **Property Held by joint Tenants by Entireties.** Membership interests held by joint tenants by the entireties shall, for purposes of voting, be deemed to one half owned by each.

## ARTICLE VII

## MANAGEMENT

7.1 **Management Vested With Manager.** Subject to any power and authority which this agreement or the Act expressly vests to the Members the business and affairs of the Company shall be managed by a Manager, exclusively. The Manager(s) has (have) the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company. Any action taken by the Manager(s) shall constitute the act of and serve to bind the Company providing any matter requiring the vote of the Members in accord with Section 6.1 must be approved by the Members. The Manager(s) shall devote such time and effort as may reasonably be required to conduct the Company's business and perform responsibilities.

7.2 **Original Manager(s).** The ordinary and usual decisions concerning the business affairs of the Company shall be made by the alternative Managers as provided. Operating decisions involving the first four locations of Cura Resource Group, LLC shall be made by Salvatore A. Craparotta as Manager. Operating decisions involving locations beyond the first four locations, shall be made by Joseph Craparotta. Business decisions of a general nature and tax matters as set forth in Internal Revenue Code Section 6211 through 6723 and related tax elections shall be made by Salvatore A. Craparotta.

A Manager's right to manage the Company property shall not constitute a property right and is not assignable or assumable by another.

Upon the death of Salvatore A. Craparotta or upon him reaching age 75, Joseph Craparotta shall be the sole Manger, if he is still active in the Company.

If he is unavailable or unwilling to serve, as Manager, the Successor Manager shall be determined by vote of the Members based upon sharing ratios.

During a period of disability, the members shall appoint a Successor Manager to serve during the disability.

Each Member, by their execution of this Agreement, consents to the appointment of the Managers.

Joseph Craparotta acknowledges that where he acts as a Manager for Cura Resource Group, LLC decisions, that he is a Co-Manager with Stephen Brillati, as provided for in the Cura Resource Group, LLC Operating Agreement and that he will acknowledge, ratify and affirm the Cura Resource Group, LLC Operating Agreement including but not limited to the Brillati Option to purchase on-third (33⅓%) of the Company's interest in Cura Resource Group, LLC.

**7.3   Term of Office as Manager.** The Manager(s) shall have no contractual right to such position. The Manager(s) shall serve until the earlier of his or her withdrawal from the Company or his or her removal as Manager or other vacancy due to death, disability, bankruptcy or conviction of a serious crime. During such term and subject to Section 6.1, the Manager(s) shall have the power to make, execute, acknowledge and file any and all Agreements, contracts, documents, certifications and interments necessary and convenient in connection with the operation and management of the Company.

**7.4   Authority of Members to Bind the Company.** The Members agree as between themselves that only the Manager(s) and authorized agents of the Company shall have the authority to bind the Company. No Member other than the Manager(s) shall take any action as a Member to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member. Each Member, by executing this Agreement or a counterpart hereof, does hereby irrevocably constitute and appoint each Manager with the full power of substitution, as such Member's true and lawful attorney in fact in his name, place and stead with regard to Member-Company matters not requiring a vote of the Members. This power of attorney is coupled with an interest and is irrevocable.

**7.5   Actions of the Manager.** The Manager(s) has (have) the power to bind the Company as provided in this Article VII. The act of the Manager(s) for the purpose of apparently carrying on the business or affairs of the Company in the ordinary course, including the exercise of the authority indicated in this Article VII, shall bind the Company, and no person dealing with the Company shall have any obligation to inquire into the power or authority of the Manager(s) when he(they) is(are) acting on behalf of the Company. Further, the Manager(s) may appoint officers with limited authority or delegate day to day management to others, but with supervision.

The Manager(s) shall not have any authority to:

16

| | |
|---|---|
| a. | Perform any act in violation of this Agreement or any applicable law or regulation thereunder. |
| b. | Do any act required to be approved or ratified by Members under the Act or this Agreement, including, without limitation, those set forth in Section 6.1. |
| c. | Commingle the funds of the Company with those of another person. |
| d. | Do any act which would make it impossible to carry on the business of the Company. |
| e. | Use or assign Company property other than for Company purposes. |
| f. | Perform, knowingly, any act that would subject the Members to unlimited liability in any jurisdiction. |
| g. | Invest in any other active business or company without the unanimous consent of the Members. |

**7.6    Compensation of Manager.**  The Manager(s) shall be reimbursed all reasonable expenses incurred in managing the Company and shall be entitled to compensation, in an amount to be determined by Section 7.15 of this Agreement.

**7.7    Standard of Care; Liability.**  The Manager(s) shall have a fiduciary responsibility to the Members and shall discharge such duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the Manager (s) reasonably believe(s) to be in the Company's best interests. Absent knowledge on the part of a Manager, the Manager(s) may rely on reports, information, opinions on statements prepared by Members or employees, legal or financial counsel or other professionals whom the Manager (s) reasonably believe(s) to be reliable, compliant or expert. The Manager(s) shall not be liable for monetary damages to the Company for any breach of duties except to (a) receipt of a financial benefit to which they are not entitled; (b) voting for or assenting to a distribution to Members in violation of this Operating Agreement or the Act; or (c) a knowing violation of the law; (d) a knowing violation of the Articles or the Operating Agreement (e) knowingly doing harm to the success or continuity of the Business, (f) knowingly using assets not for the exclusive benefit of the Company, or; (g) any exercise of lack of good faith and actions constituting gross negligence, willful misconduct, fraud or bad faith.

**7.8    Removal of Manager.**  The Manager(s) may be removed as Manager by the affirmative vote of 95% of all Sharing Ratios of the Members, with or without cause.

**7.9    Additional Authority.**  The Manager(s) is(are) authorized to take all action and execute all agreements, instruments, certificates and documents in the name of and in behalf of the Company, pay expenses, open bank accounts and make filings as in his judgment necessary, proper or advisable to carry out the business purposes of the Company.

**7.10    Other Activities – Non Compete.**  Subject to the conduct of the Company's business involving dealings with Members on an arm's length basis and on reasonably commercial terms, the Manager, and Affiliate or owner of any of the Members and any Member may engage in or possess an interest in other business ventures or investments of any kind not in competition with

the business of the Company, as defined below, and with the restrictions herein. The fact that a Manager, any Affiliate or owner of a Member or any Member may avail itself of other opportunities either by itself or with other persons, including persons in which it has an interest, and not offer such opportunities to the Company or to the Members, shall not subject the Manager, the Member of such Affiliate and any Member to liability to the Company or to any other Member on account of lost opportunity. Neither the Company nor any Member shall have any right by virtue of this Agreement or the relationship created hereby in or to such opportunities, or to the income or profits derived therefrom, and the pursuit of such opportunities, except for those competitive with the business of the Company, and such actions shall not be deemed wrongful or improper or in violation of this Agreement. Nothing contained in this Agreement shall be construed as preventing a Member or Manager from engaging in any other business activity other than the business of the Company. As a material part of the consideration for execution of this agreement by each Member or Manager, each Member and Manager hereby waives, relinquishes and renounces any such claim or right of participation for other business and accepts the non competition provisions outlined below.

The Manager, its members and affiliates agree that the essence of this business is the provision of resources and facility management for Herbalife products or their successors or others in a similar business competitive with Herbalife or an entity to which the Cura Resource Group, LLC is providing similar services at the time. Each of the parties agree and acknowledge that a covenant not to compete is commercially reasonable and necessary to protect these assets.

Accordingly, each Manager, Member and affiliate during the period of membership, ownership or service as Manager or Member and for a period of five (5) years thereafter agrees not to a) engage or participate anywhere in the world, as an owner, partner, member, independent contractor, employee, consultant, agent, advisor or (without limitation by specific enumeration of the foregoing) otherwise in any company, enterprise, joint venture or other person or entity (each a "Competitor") which competes, directly or indirectly with the business (ii) Solicit or attempt to solicit for business of the type conducted by the Business, any person or entity who is or has been a customer, supplier, distributor, licensor, licensee or in any business relationship with the Company within the past two (2) years, or attempt to solicit or attempt to solicit such person or entity to cease doing business with or alter or limit its business relationship with the Business (iii) Take any actions which are calculated to persuade employees, independent contractors, representatives or agents of the Business to change or terminate their association with the Business or hire or otherwise retain the services of any of its employees, independent contractors (other than attorney or CPA) or agents (whether full or part-time or otherwise) who is acting in such capacity or has acted in such capacity at any time within the six (6) month period immediately preceding such proposed date of hire or retention.

Nothing contained herein shall preclude a Member from owing a passive investment of two percent (2%) or less of a public traded security.

The Company and Members recognize and agree that the territory, time and service limitations are reasonable, proper and required for the protection of the Company. If such limitations or lack thereof are deemed unreasonable by a court of competent jurisdiction, the

Company and Member agree to submit to the imposition of such limitations as said court shall deem reasonable.

**7.11   Potential Conflicts.** The Manager(s) is(are) authorized to purchase property from, sell property to or otherwise deal with a Member or a Manager provided that the transaction shall be on terms and conditions which are no less then favorable to the company had the transaction been with an independent third party at a fair market value. Whenever possible the Manager(s) shall fully disclose to all Members all material facts relative there to and obtain the approval of a majority of disinterested Members. Should obtaining prior approval not be feasible, the Manager(s) shall seek ratification by a majority of the disinterested members after the fact. The lack of approval shall not affect the validity of the transaction *vis a vis* any unrelated third party.

**7.12   Tax Matters Partner.** As used in this agreement the Tax Matters Partner shall have the meaning as set forth in the Code and shall have the full power and authority to act as such for the Company and Members. The duty of the Tax Matters Partner is to keep the Members informed of administrative and judicial proceedings involving tax issues relating to the Company, its property or business, this duty shall be limited to a duty to inform each Member of the beginning, completion and results of such proceedings.

The Tax Matters Partner also shall have the exclusive right, but not the obligation, to act for the Company and its Members in negotiating, settling and/or refusing to settle tax issues raised by any taxing authority with respect to any items related to the Company, its property or business, and any action taken by the Tax Matter Partner pursuant to such right shall be binding on the Company and its Members without recourse to the Tax Matter Partner. No other Member shall have the right to act for the Company or for itself or for any other Member with respect to any such tax issue. No Member shall negotiate or settle such tax issues unless and until the Tax Matter Partner shall consent thereto in writing on gives written notice that it delivers its exclusive rights to bind the Company and its Members to settle or refuse to settle a tax issue to another Member. If a Member obtains the right to negotiate or settle any such tax issues, such Member shall give prompt written confirmation thereof to the other Members and also will give written notice of the terms of any settlement.

Each Member hereby designates and appoints the Tax Matter Partner, including any person herein after so designated, as such Members true and lawful attorney in fact, with full power and authority to act in the Members name and on the Member's name and on the Members behalf in negotiating, settling on, refusing to settle any tax issues relating to the Company, its Property or its business. The foregoing Power of Attorney (and other Powers of Attorney granted here under or pursuant thereto) is a special Power of Attorney coupled with an interest , is irrevocable and shall survive the transfer or assignment by a Member of its Company interests and the death or disability of each Member or its Affiliate. At the request of the Tax Matter Partner each Member shall execute and acknowledge a separate instrument substantially similar to the foregoing provisions.

The Tax Matter Partner and their Agents shall in no event be liable for loss or damages to the Company or any Member arising out of the exercise of the rights and/or performance of their responsibilities referred to in this section. The Company or if appropriate, the

19

Members shall reimburse the Tax Matter Partner for all costs and expenses incurred by the Tax Matter Partner and shall indemnify, defend and hold harmless the Tax Matter Partner from all claim, liabilities, losses, costs and expense including but not limited to attorney fees and court costs incurred by the Tax Matter Partner in the exercise of their duties.

**7.13     No Personal Liability of Manager.**   The Manager(s) shall not be personally liable under any judgement of any court or in any manner for a debt, obligation or liability of the Company, however arising solely by reason of being a Manager

**7.14     Restrictions on Hiring Family Members.**   So long as Joseph Craparotta is a Member, the Manager(s) shall not be permitted to hire any relative (except for Salvatore or Joseph) of Salvatore Craparotta or any relative of Stephen Brillati (except for Stephen) as long as he or his affiliate is a Member of Cura Resource Group, LLC without the unanimous consent of Joseph Craparotta and Stephen Brillati.  This prohibition extends to both S&J Cura Investments Group, LLC and Cura Resource Group, LLC

**7.15     Guaranteed Payments for Services.**   The Company shall make mandatory payments for services to Salvatore A. Craparotta and Joseph Craparotta for services for which payments shall be an ordinary expense in calculating net profits for the year.

For Joseph Craparotta, so long as he is working full time, not disabled or deceased, He shall be paid for services as follows:

(i)     Adequate health insurance
(ii)    45% of the tax income allocable to S&J Cura Investments, LLC from the Cura Resource Group, LLC investment earned from the first four locations.
(iii)   55% of the tax income from the other locations of Cura Resource Group, LLC allocable to S&J Cura Investments, LLC.
(iv)    Disability shall mean the inability to perform full time management functions for a period of three (3) months consistent with past performance.
(v)     Inactivity shall mean an unwillingness to perform management functions for a period of one month after receiving written notice to perform management functions consistent with past practice.

For Salvatore A. Craparotta, so long as he is living, shall be paid for current and past services as follows:

(i)     Adequate health insurance.
(ii)    Up to 45% of the taxable income allocable to S&J Cura Investments, LLC from Cura Resource Group, LLC earned from the first four locations.
(iii)   Up to 35% of the taxable income from the other locations of Cura Resource Group, LLC allocable to the S&J Cura Investments Group, LLC
(iv)    The decision as to the amounts allocate under (ii) and (iii) shall be made by Salvatore A. Craparotta.

20

(v)      Upon the death of Salvatore A. Craparotta, the 45% and 55% shares shall be cancelled and allocated to the profit for the year.

## ARTICLE VIII

### EXCULPATION OF LIABILITY; INDEMNIFICATION

**8.1     Exculpation of Liability.** Unless otherwise provided by law or expressly assumed, a person who is a Member and/or Manager shall not be liable for the acts, debts or liabilities of the Company, except to the extent of their capital contributions, unless the Act or Agreement expressly provides otherwise.

**8.2     Indemnification.**

**8.2.1** The Company shall indemnify from Company assets only to the full extent permitted by law, as the same exists or may hereafter be amended, every person acting in good faith and reasonable beliefs in the interests of the Company who was or is a party, or is threatened to be made a party, to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal, including actions by or in the right of the Company by reason of the fact that such person is or was a Member, Manager, employee or agent of the Company or Successor or Assigns or is or was serving at the request of the Company as a director, officer, Member, Manager, partner, trustee, employee or agent of another foreign or domestic corporation, limited liability company, partnership, joint venture, trust or other enterprise, whether for profit or not, from and against any and all losses, damages, liabilities, claims, demands and expenses, including attorneys' fees, judgments, penalties, fines and amounts paid in settlement incurred by such person in connection with the action, suit or proceeding; provided, however, that, except as provided in Section 8.2.2, the Company shall indemnify any such person seeking indemnification in connection with a proceeding ( or part of a proceeding) initiated by such person only if such proceeding (or part of a proceeding) was in connection with the Company business, in furthermore of the company's interests or because the party was a Manager or Member, but subjects to section 7.7. The right to indemnification conferred in this Section shall be a contract right and, subject to the limitations set forth above, shall include the right, to the fullest extent permitted by law, as the same exists or may hereafter be amended, to be paid by the Company the expenses incurred in defending any such proceedings in advance of its final disposition.

**8.2.2** If a claim under Section 8.2.1 is not paid in full by the Company within thirty (30) days after a written claim has been received by the Company the claimant may at any time thereafter bring suit against the Company to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall be entitled to be paid also the expense of prosecuting such claim including reasonable attorney fees. It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any is required, has been rendered to the Company) that the claimant has not met the standards of conduct which make it permissible under applicable law for the Company to indemnify the claimant for the amount

21

claimed, or failed to meet the standards of conduct under Section 7.7, but the burden of proving such defense shall be on the Company. Neither the failure of the Company (including its Members or its independent legal counsel) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth by applicable law or Section 7.7, nor an actual determination by the Company (including its Members or its independent legal counsel) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

8.2.3 The Company shall have power, to the extent now or hereafter provided by law, to purchase and maintain insurance on behalf of any person who is or was a Member, Manager, employee or agent of the Company, or is or was serving at the request of the Corporation as a director, officer, Member, Manager, partner, trustee, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such.

## ARTICLE IX

## DISSOLUTION AND WINDING UP

9.1 **Dissolution.** The Company shall dissolve and its affairs shall be would up on the first to occur of the following events: (a) upon the happening of a Sale (as defined in Section 9.2); (b) by the consent of all of the Members; (c) any other event which under the Act or otherwise as provided by law causes the dissolution and termination of the Company or (d) an event that makes it unlawful or impossible to carry on the business of the Company.

9.2 **Dissolution Upon Sale.** Without any further act or deed by the Members or the Manager, the Company shall automatically dissolve and its affairs shall be would up upon the consummation of a Sale. For the purposes of this Operating Agreement, a "Sale" shall mean: (1) an initial public offering of equity securities if they constituted greater than 80% in value of the assets, pursuant to a registration statement which has been filed and become effective under the Securities Act of 1933; (2) a merger or consolidation of equity securities with or into another entity, in which the L.L.C. equity security is not the surviving entity or the Members of the equity company prior to such merger or consolidation do not own a majority of the voting securities of the surviving entity; or (3) a sale of all or substantially all of the assets to a third party.

9.3 **Winding Up.** On dissolution, the Company shall cease carrying on its business and affairs and shall begin winding them up. The Company shall complete the winding up as soon as practicable. Upon the winding-up of the Company, its assets shall be distributed first to creditors to the extent required by law, in satisfaction of Company debts, liabilities and obligations and then to Members. Distributions to Members shall be made first to correct any imbalances in the Members' Capital Accounts and then in accordance with the Members' Sharing Ratios. In no event shall a distribution cause a Member's Capital Account to fall below a positive amount. The proceeds shall be paid to the Members within 90 days after the date of winding up.

Upon dissolution of the Company, the Manager(s) shall act as a Liquidator of the Company. The Members also hereby appoint the Manager(s) as their true and lawful attorney in fact for this purpose. The Liquidator shall, with reasonable speed, wind up the affairs of the Company and liquidate the property assets. The Liquidator shall use reasonable commercial discretion to determine the time, manner and terms of sale of any property, have due regard to the activity and condition of the relevant market and general financial and economic conditions. The Liquidator shall promptly distribute the proceeds of the liquidation in accordance with the terms and conditions of this Section 9.3.

The Members shall look solely to the Company's property for the return of the capital contributions or capital accounts and if the Company's property after payment of debts and liabilities is insufficient, no Member shall have recourse against the Manager except as provided in section 7.7 or against any Member.

**9.4    Continuation of Company After Disassociation.** Notwithstanding the death, withdrawal, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company, the business and affairs of the Company may continue if, within 90 days, a majority of the remaining Members vote to continue the existence of the Company

**9.5    No Obligation to Restore Deficit Balances.** If any Member has a deficit balance in such Members capital account, at any time, such Members shall have no obligation to make any contribution to the capital of the Company and such deficit shall not be considered a debt owed to the Company or to any person for any purpose whatsoever.

## ARTICLE X

## GENERAL PROVISIONS

**10.1    Terms.** Nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person or persons, firm, or corporation may in the context require. Person means any individual, partnership, corporation, limited liability company, trust, estate, qualified plan or other entity.

**10.2    Article Headings.** The Article headings contained in the Operating Agreement have been inserted only as a matter of convenience and for reference, and in no way shall be construed to define, limit or describe the scope or intent of any provision of this Operating Agreement.

**10.3    Counterparts.** This Operating Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same agreement. Copies (whether facsimile, photostatic, or otherwise) of this agreement and its signatures shall be deemed to be only originals and may be relied upon to the same extent as the originals.

23

**10.4    Entire Agreement.**   This Operating Agreement contains the entire agreement among the parties with respect to its subject matter and supersedes any and all other agreements, either oral or written, between the parties with respect to such subject matter. The parties have made independent investigations of the Company and acknowledge that no representations or agreements other then set forth there in have been made with respect thereto.

**10.5    Severability.**  The parties to this Operating Agreement expressly agree that it is not their intent to violate any public policy, statutory or common law rule, regulation, or decision of any governmental or regulatory body.  If any provision of this Operating Agreement is judicially or administratively interpreted or construed to be in violation of any such policy, rule, regulation, or decision, the provision causing such violation will be inoperative (and in lieu thereof there will be inserted such provision as may be valid and consistent with the intent of the parties under this Operating Agreement) and the remainder of this Operating Agreement, as amended, will remain binding upon the parties, unless the inoperative provision would cause enforcement of the remainder of this Operating Agreement to be inequitable under the circumstances.

**10.6    Amendment.**  This Operating Agreement may be amended or revoked at any time by a written agreement executed by all of the parties to this Operating Agreement.  No change or modification to this Operating Agreement shall be valid unless in writing and signed by the required vote of the parties to this Operating Agreement.

**10.7    Notices.**  Any notice permitted or required under this Operating Agreement shall be conveyed to the party at the address reflected in this Operating Agreement and will be deemed to have been given when deposited in the United States mail, postage paid, or when delivered in person, or by courier or by facsimile transaction.

**10.8    Binding Effect.**  Subject to the provisions of this Operating Agreement relating to transferability, this Operating Agreement shall be binding on and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and assigns.

**10.9    Governing Law.**  This Operating Agreement is being executed and delivered in the State of Michigan and shall be governed by, construed and enforced in accordance with the laws of the State of Michigan without giving effect to any conflicts of law rules. Each Member consents and submits to the personal jurisdiction of any state or federal court within Michigan, waives the right to change the venue of litigation and agrees to service of process by mail.

**10.10    Successors and Assigns.**  This Agreement and all the terms and provisions hereof shall be binding upon and shall inure to the benefit of the Members and their respective heirs, executors, administrators, successors and permitted assigns.  Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all the terms, conditions and obligations of this Agreement to which his predecessor in interest was subject or bound, without regard to whether such person has executed this Agreement or a counterpart hereof or any other documents contemplated hereby.  No person shall have any rights or obligations relating to the Company greater than those set forth in the Agreement, and no person shall acquire

24

an interest in the Company or become a Member thereof except as permitted by the terms of this Agreement.

**10.11  Additional Assurances.** Upon the request of the Manager, each Member agrees to perform all further acts and execute, acknowledge and deliver any documents which the Manager (s) deem(s) reasonably necessary to effectuate the provision of this Agreement.

**10.12  Partition.** Each of the parties hereto irrevocably waives during the term of the Company any right that he may have to maintain any action for partition with respect to Company Property or cause any sale of Company property.

**10.13  No Waiver.** Failure or delay of any party in exercising any right or remedy under this Agreement, or any other agreement between the parties, or otherwise, will not operate as a waiver thereof. The express waiver by any party of a breach of any provision of this Agreement by any other party shall not operate or be construed as a waiver of any subsequent breach by said party. No waiver will be effective unless and until it is in written form and signed by the waiving party.

**10.14  No Third Party Rights.** This Agreement and the covenants and agreements contained herein are solely for the benefit of the parties hereto and their Affiliates. No other person, including creditors, shall be entitled to enforce or make any claims, or have any rights pursuant to the provisions of this Agreement.

**10.15  Affiliate.** For purposes of this Agreement, Affiliate shall mean any person, entity, officer, shareholder, partner or Member that directly or indirectly through one or more intermediaries has a 20% interest of value or voting control or is under common control in or by a Member or Members; as well as officers, shareholders, partners or members of a Member. It also includes spouses and legal descendants as provided by Section 269 of the Code. For purposes of this definition, the term "controls," "is controlled by," or "is under common contact with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and polices of a person or entity , whether through its ownership of voting securities by contract or otherwise.

**10.16  Registration.** The Members acknowledge that the membership interest have not been registered under the federal or state security laws in reliance on exemptions. The Members hereby covenant and represent that they are acquiring their interests solely for investment purposes and not with a view to distribution. Each Member indemnifies the Company and other Members for such a breach.

**10.17  Confidentiality.** As an inducement for the Company and its Members to enter into this Agreement, each of the Members agrees that for the longest period permitted by law, the Members shall and shall cause their affiliates to maintain all confidential information in confidence and not disclose to anyone outside of the Company and shall not use any confidential information for their benefit or the benefit of any third party except as provided for in a written agreement, except to the extent as required by law.

25

Confidential Information means information regarding the Business to the extent it is confidential, including, but limited to (i) its operations and financial condition, (ii) pricing, sales, marketing, capital expenditures, costs, alliances, (iii) employees, sales representatives including identity, responsibilities, competences and compensation, (iv) customer lists, current and prospective, customers' identities, contact persons and purchasing patterns, (v) forecasts, business plans, (vi) trade secrets and proprietary information (vii) software code, program source documents, (viii) technical information, patent and copyright applications, drawings, models, know-how, discoveries, inventing, improvements, technique, methods, algorithms, designs and (ix) website designs and content.

For purposes of this Section Business means the operations of Cura Resource Group, LLC., its operations and Confidential means not available to the public or though legal means.

**10.18   Conflicts of Interest.** EACH MEMBER AND MANAGER ACKNOWLEDGES THAT IT HAS BEEN ADVISED THAT A POTENTIAL CONFLICT OF INTEREST EXISTS AMONG THEIR INDIVIDUAL INTERESTS AND THAT BY EXECUTION HEREOF, ACKNOWLEDGES THAT THEY HAVE BEEN ADVISED TO SEEK INDEPENDENT LEGAL, TAX AND FINANCIAL COUNSEL AND HAS HAD THE OPPORTUNITY TO DO SO AND WILL DO SO REGARDING ALL FUTURE MATTERS. Each Member, Manager, party or Affiliate has had all information necessary or will seek such information via a written agreement to make an informed decision with regard to this Agreement or operation of the Company and that any claims regarding any possible conflict against Joseph P. Galasso or any of his affiliates with regard to this Agreement, the Company or the preparation, or operation of the Agreement or the Company are freely and voluntarily waived.

**10.19   Member Relationship.** Nothing in this Agreement shall be interpreted or construed to constitute any Member as the agent of any other Member or except as expressly provided in this Agreement, to restrict Members from carrying on their respective businesses or activities.

**10.20   Further Action.** Each Member agrees to perform all further acts and execute, acknowledge and deliver any documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

**10.21   Specific performance and Damages.** The Members understand and agree that any Member may suffer irreparable damage in the event this Agreement is not specifically performed according to its terms. Accordingly, the Members agree that all the terms of this Agreement shall be enforceable in a court having equity jurisdiction by a decree of specific performance or by injunction or both, provided, however, the foregoing shall not be construed as prohibiting any of the Members from pursuing any additional remedies for a breach or threatened breach of this Agreement including the recovery of damages, consequential damages or lost profits. Each and every right, remedy and power hereby granted to any party or allowed by law shall be cumulative and not exclusive of any other.

Payment of any damages under this clause shall not affect the right of the non-breaching parties to enforce this clause against the other Members if necessary through legal action.

**10.22   Attorney Fees.**  In the event of any controversy, claim or action being made, filed or instituted between the parties to this Agreement or any of the other documents related hereto or arising from the breach of any provision hereof, the prevailing party will be entitled to receive from the other party all costs, damages and expenses including attorney fees incurred by the prevailing party whether or not such controversy or claim is litigated or prosecuted to judgment.

**10.23   Incorporation by Reference.**  Each exhibit or schedule attached and referred to in this Agreement is hereby incorporated herein.

**10.24   Code and Regulation Usage.**  Code means the Internal Revenue Code of 1986 as amended from time to time.  Regulations means Federal Income Tax Regulations promulgated under the Code.  Unless otherwise defined, terms used herein shall have the meaning provided by the Code and Regulations.

**10.25   Profits and Losses.**  Profits and losses for any fiscal year or other period means the amount equal to the Company's taxable income for federal income tax purposes for such year or period determined in accordance with the Code under Section 703(a) and the Regulations thereunder with the following adjustments:

(i)   All items of income, gain, loss and deduction required to be separately stated shall be included in taxable income.

(ii)   Income exempt from federal income tax shall be treated as income and expense not deductible shall be treated as expense.

(iii)   Expenditures described in Section 705(a)(2)(B) or treated as expenditures under Regulation 1.704-1(b)(2)(iv)(i) shall be subtracted.

(iv)   Gain or loss resulting from the disposition of property recognized for federal income taxes and depreciation shall be determined with reference to asset value.  Asset value means as to any Company asset (a) the fair market value when contributed by a Member (b) the fair market value on the date of distribution to a Member or (c) gains in the asset unless otherwise provided by the Code.

"Regulations" means income tax regulations, including temporary regulations, promulgated under the code, as such regulations may be amended form time to time including corresponding provisions of succeeding regulations.

**10.26   Fiduciary Duty.**  Each Member and Manager acknowledges that it has a fiduciary duty to the Company except as modified herein.

**10.27  Warranty and Representation as to Power.**  Each Manager and Member represents and warrants that it has the power and authority to execute and comply with the terms of this Agreement and such execution is not in contravention of any other agreement or contract.

**10.28  Assurance of Return.**  No assurance can be given that the investment objection of the Company can be achieved. This Agreement is in the best interests of the Company and its Members, even though restrictions herein may affect the value and that each Member may have disadvantages and each party acknowledged this expressly by their signature below.

**10.28  Computation of Accountants.**  Except as to matters as to which the Manager(s) is(are) granted discretion under this Agreement, the opinion of the CPA retained by the Company from time to time shall be binding and final with respect to all computations or determinations or allocations made  under this Agreement, absent manifest error.

**[Signature page follows]**

**OPERATING AGREEMENT**
**FOR**
**S&J CURA INVESTMENTS, LLC**

**[Signature Page]**

**IN WITNESS WHEREOF,** The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

**THE COMPANY MANAGER:**

_____
Witness

_____
Salvatore A. Craparotta

_____
Witness

_____
Joseph Craparotta

**MEMBERS:**

_____
Witness

_____
Salvatore A. Craparotta, Trustee of the
Salvatore A. Craparotta Trust as amended

_____
Witness

_____
Joseph Craparotta

_____
Witness

_____
Steven Craparotta

_____
Witness

_____
Anne Michaels

_____
Witness

_____
Anette Craparotta

29

OPERATING AGREEMENT
FOR
S&J CURA INVESTMENTS, LLC

[Signature Page]

IN WITNESS WHEREOF, The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

THE COMPANY MANAGER:

Witness

_____
Witness

_____
Salvatore A. Craparotta

_____
Joseph Craparotta

MEMBERS:

Witness

_____
Witness

_____
Salvatore A. Craparotta, Trustee of the
Salvatore A. Craparotta Trust as amended

_____
Joseph Craparotta

_____
Witness

_____
Steven Craparotta

_____
Witness

_____
Anne Michaels

_____
Witness

_____
Anette Craparotta

29

OPERATING AGREEMENT
FOR
S&J CURA INVESTMENTS, LLC

[Signature Page]

IN WITNESS WHEREOF, The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

THE COMPANY MANAGER:

_____          _____
Witness                                              Salvatore A. Craparotta

_____          _____
Witness                                              Joseph Craparotta

MEMBERS:

_____          _____
Witness                                              Salvatore A. Craparotta, Trustee of the
                                                          Salvatore A. Craparotta Trust as amended

_____          _____
Witness                                              Joseph Craparotta

_____          _____
Witness                                              Steven Craparotta

_____          _____
Witness                                              Anne Michaels

_____          _____
Witness                                              Anette Craparotta

29

01/04/2011  14:04    158678:4818       SOUTH RIVER MAR        PAGE  01/01

## OPERATING AGREEMENT
### FOR
### S&J CURA INVESTMENTS, LLC

### [Signature Page]

IN WITNESS WHEREOF, The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

### THE COMPANY MANAGER:

| | |
|---|---|
| Witness | Salvatore A. Craparotta |
| Witness | Joseph Craparotta |

### MEMBERS:

| | |
|---|---|
| Witness | Salvatore A. Craparotta, Trustee of the Salvatore A. Craparotta Trust as amended |
| Witness | Joseph Craparotta |
| Witness | Steven Craparotta |
| Witness | Anne Michaels |
| Witness | Anette Craparotta |

29

<u>EXHIBIT A</u>

## OPERATING AGREEMENT
## FOR
## S&J CURA INVESTMENTS, LLC

| <u>Member Name and Address</u> | Capital<br><u>Contribution</u> | Interest in<br><u>Capital</u> | Sharing<br><u>Ratio</u> |
|---|---|---|---|
| Joseph Craparotta<br>1063 Sunningdale<br>Grosse Pointe Woods, Michigan 48236 | $ 33.30 | 33.3% | 33.3% |
| Steven Craparotta<br>623 Rivard<br>Grosse Pointe, Michigan 48230 | 22.00 | 22.0% | 22.0% |
| Anne Michaels<br>274 Mt Vernon<br>Grosse Pointe Farms, Michigan 4 8236 | 22.00 | 22.0% | 22.0% |
| Anette Craparotta<br>5019 Groveland Terrace<br>Naples, Florida 34119 | 22.00 | 22.0% | 22.0% |
| Salvatore A. Craparotta, Trustee of the<br>Salvatore A. Craparotta Trust as amended<br>5019 Groveland Terrace<br>Naples, Florida 34119 | 0.70 | 0.70% | 0:7% |
| | $100.00 | | |

30

# OPERATING AGREEMENT
## FOR
## S&J CURA INVESTMENTS, LLC

### [Signature Page]

**IN WITNESS WHEREOF,** The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

#### THE COMPANY MANAGER:

Witness _____

_____
Witness

_____
Salvatore A. Craparotta

_____
Joseph Craparotta

#### MEMBERS:

_____
Witness

_____
Salvatore A. Craparotta, Trustee of the
Salvatore A. Craparotta Trust as amended

_____
Witness

_____
Joseph Craparotta

_____
Witness

_____
Steven Craparotta

_____
Witness

_____
Anne Michaels

_____
Witness

_____
Anette Craparotta

29

# OPERATING AGREEMENT
## FOR
## S&J CURA INVESTMENTS, LLC

### [Signature Page]

**IN WITNESS WHEREOF,** The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

### THE COMPANY MANAGER:

_____
Witness

_____
Salvatore A. Craparotta

_____
Witness

_____
Joseph Craparotta

### MEMBERS:

_____
Witness

_____
Salvatore A. Craparotta, Trustee of the
Salvatore A. Craparotta Trust as amended

_____
Witness

_____
Joseph Craparotta

_____
Witness

_____
Steven Craparotta

_____
Witness

_____
Anne Michaels

_____
Witness

_____
Anette Craparotta

29

OPERATING AGREEMENT
FOR
S&J CURA INVESTMENTS, LLC

[Signature Page]

IN WITNESS WHEREOF, The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

THE COMPANY MANAGER:

Witness

Witness

Salvatore A. Craparotta

Joseph Craparotta

MEMBERS:

Witness

Witness

Salvatore A. Craparotta, Trustee of the Salvatore A. Craparotta Trust as amended

Joseph Craparotta

Witness

Steven Craparotta

Witness

Anne Michaels

Witness

Anette Craparotta

29

# EXHIBIT 2

{01938860}

## ASSIGNMENT OF MEMBERSHIP INTEREST

This Assignment of Membership Interest ("Assignment") is effective the 31st day of December, 2016 ("Effective Date"), by and between **Anette Craparotta (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)** ("Assignor") and **Salvatore Craparotta Revocable Trust, Salvatore Craparotta Trustee (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)**, ("Assignee").

### RECITALS

Assignor's address is 2644 Fountain View Circle, Naples, Florida 34109.

Assignor agrees to transfer a 22% limited liability company interest in **S&J Cura Investments, LLC (26-1694938)** to the Assignee. This represents the entire investment owned by the Assignor.

NOW, THEREFORE, for such good and valuable consideration, receipt and adequacy of which is hereby admitted and acknowledged, the following is hereby agreed to:

### ASSIGNMENT

Assignor does hereby assign the 22% membership interest in S&J Cura Investments, LLC and Assignee does hereby accept the assignment of the interest with full powers of a member.

### ASSUMPTION

The Assignee does hereby agree by execution hereof to assume all further responsibility from Assignor and to indemnify Assignor from any and all liabilities that Assignor may become liable for relating to Assignor's investment in the Company for events occurring after the effective date. Further, Assignee consents to the terms of the Operating Agreement of S&J Cura Investments, LLC.

### PROFIT AND LOSS

The taxable profits, losses and cash flow from the Company will be allocated to the Assignee and Assignor in proportion to the actual number of days that they each shall own the Interest during the calendar year.

### COUNTERPARTS

This Assignment may be executed in several counterparts, each of which so executed shall be deemed to be an original, but such counterparts shall together constitute and be one and the same instrument.

### RATIFICATION

The Assignee does hereby ratify and republish all of the other terms and conditions of the Operating Agreement of S&J Cura Investments, LLC not otherwise modified by this Assignment.

## CONFLICT

Each of the parties acknowledge that Joseph P. Galasso, Jr. has been retained to draft this document and he is in a conflict situation. Accordingly, each party acknowledges by their signature that they have been advised to seek the advice of separate counsel before signing the document and have had the opportunity to do so. Each party acknowledges that the signatures are their own free will, voluntary and under no duress.

IN WITNESS WHEREOF, the Assignment for assignment and transfer has been executed by the undersigned, and the undersigned has agreed to be bound hereby by executing this Assignment.

Witness: _____

**ASSIGNOR:**

_____
Anette Craparotta

**ASSIGNEE:**

Witness _____

_____
Salvatore Craparotta Revocable Trust, Salvatore Craparotta, Trustee

2

## CONSENT OF MANAGER

The undersigned, Salvatore Craparotta, being the Manager of **S&J Cura Investments, LLC**, a Michigan limited liability company, (EIN: 26-1694938), does hereby consent to the assignment and transfer of the Assignor's limited liability interest in the company to Assignee, all in accordance with the attached form of Assignment of Membership Interest.

This Consent by the Manager is based upon the accuracy of all statements and representations set forth in the aforementioned documents.

DATED:_____, 2016

        S&J Cura Investments, LLC, a
        Michigan limited liability company

        By: _____
            Salvatore Craparotta, Its Manager

3

# EXHIBIT 3

CSD700(Rev 1/02)

## MICHIGAN DEPARTMENT OF CONSUMER & INDUSTRY SERVICES
### CORPORATION AND LAND DEVELOPMENT BUREAU

(FOR BUREAU USE ONLY)

Date Received

## FILED

This document is effective on the date filed, unless a subsequent effective date within 90 days after received date is stated in the document.
JAN 10 2008

by Administrator
Bureau of Commercial Services

EFFECTIVE DATE:

Name
JOSEPH P GALASSO JR ATTORNEY AT LAW

Address
30685 BARRINGTON AVE #120

| City | State | Zip Code |
|---|---|---|
| MADISON HEIGHTS | MI | 48071-5109 |

Document will be returned to the name and address you enter above.
If left blank document will be mailed to the registered office.

E0114U

### ARTICLES OF ORGANIZATION
### For use by Domestic Limited Liability Companies
(Please read information and instructions on last page)
*Pursuant to the provisions of Act 23, Public Acts of 1993, the undersigned execute the following Articles:*

## ARTICLE I

The name of the limited liability company is: _____ S&J CURA INVESTMENTS, LLC

## ARTICLE II

The purpose or purposes for which the limited liability company is formed is to engage in any activity within the purposes for which a limited liability company may be formed under the Limited Liability Company Act of Michigan.

## ARTICLE III

The duration of the limited liability company if other than perpetual is:_____

## ARTICLE IV

1. The street address of the location of the registered office is:

30685 BARRINGTON ST #120            MADISON HEIGHTS , Michigan ____ 48071-5109
(Street Address)                              (City)                            (ZIP Code)

2. The mailing address of the registered office if different from above:

_____ , Michigan _____
(Street Address or P.O. Box)                    (City)                            (ZIP Code)

3. The name of the resident agent at the registered office is: _____ JOSEPH P GALASSO JR.

## ARTICLE V (Insert any desired additional provision authorized by the Act; attach additional pages if needed.)

THE COMPANY WILL BE MANAGED BY A MANAGER.

Signed this ___ 8TH ___ day of ___ JANUARY ___ , ___ 2008

By _____
(Signature)
JOSEPH P GALASSO JR

5L

# EXHIBIT 4

{01938860}

Nathan Upfal
Attorney at Law

# Law Offices of
# Nathan Upfal, P.C.

121 West Long Lake Road, Suite 200
Bloomfield Hills, Michigan 48304
Direct Dial: 248.433.2576
Main: 248.642.0500
Fax: 248.671.0313
Email: upfal@jackiergould.com

June 28, 2021

Email: JGalasso@galassoandassoc.com

Joseph P. Galasso, Jr.
Galasso and Associates, CPA, P.L.C., and Galasso, P.C.
30701 Barrington Street, Suite 175
Madison Heights, Michigan 48071

     Company:   S&J Cura Investments, LLC
     Agreement:  First Amendment and Restatement of the Operating Agreement dated December 28, 2010

Dear Joe:

As you know, I am legal counsel to Joseph Craparotta. In accordance with Section 7.2 of the above-referenced Agreement, based on the age of Salvatore Craparotta (whose age is over 75), the sole Manager of the above-referenced Company is Joseph Craparotta. Please update your records and all records of the Company accordingly. In accordance with Section 7.1 of the Agreement, "Subject to any power and authority which [the Agreement] or the [Limited Liability Company] Act vests to the Members the business and affairs of the Company shall be managed by the Manager, exclusively." In accordance with Section 7.4 of the Agreement, only the Manager and authorized agents of the Company have the authority to bind the Company. Salvatore Craparotta is not an authorized agent of the Company. As also provided in Section 7.4 of the Agreement, "No Member other than the [Manager] shall take any action as a Member to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member. Each Member ... does hereby irrevocably constitute and appoint each Manager with the full power of substitution, as such Member's true and lawful attorney in fact in his name, place and stead with respect to Member – Company matters not requiring a vote of the Members. This power of attorney is coupled with an interest and is irrevocable."

The Manager designates and appoints Joseph Craparotta as the partnership representative of the Company for purposes of the Bipartisan Budget Act (BBA). The tax return of the Company must show the correct partnership representative.

Please remind Salvatore A. Craparotta of his continuing restrictions under Section 7.10 of the Agreement to refrain from competing with the Company, soliciting or attempting to solicit business of the type conducted by the Company, soliciting customers of the Company, or taking actions to persuade employees, independent contractors, representatives or agents of the Company to change or terminate their association with the Company, to the extent provided thereunder.

You are directed to release and turn over all books and records of S&J Cura Investments, LLC, to my office, no later than Friday, July 2, 2021. Please contact me promptly to make arrangements.

June 28, 2021
Page 2

Please let me know if you have any questions.

Very truly yours,

NATHAN UPFAL, P.C.

*Nathan Upfal*

Nathan Upfal

NU/rs
cc:     Joseph Craparotta

# EXHIBIT 5

| From: | Nathan Upfal |
|---|---|
| To: | Mark Zausmer; Jay S. Sherston; Sarah Clarkson |
| Cc: | Joseph Craparotta; Steve Brillati |
| Subject: | FW: STATUS OF THINGS |
| Date: | Wednesday, June 30, 2021 11:33:15 AM |

[EXTERNAL EMAIL]

**From:** Joe Galasso <JGalasso@galassoandassoc.com>
**Sent:** Wednesday, June 30, 2021 11:31 AM
**To:** Nathan Upfal <upfal@jackiergould.com>
**Subject:** RE: STATUS OF THINGS

Thank you for your response.we do not recognize joe as mgr

**From:** Nathan Upfal <upfal@jackiergould.com>
**Sent:** Wednesday, June 30, 2021 11:23 AM
**To:** Joe Galasso <JGalasso@galassoandassoc.com>
**Cc:** Rose Sherman <sherman@jackiergould.com>; Mark Zausmer <MZausmer@zausmer.com>; Jay S. Sherston <JSherston@zausmer.com>; Sarah Clarkson <sclarkson@clarksonlawpllc.com>; Joseph Craparotta <jcraparotta@curarg.com>
**Subject:** RE: STATUS OF THINGS

Joe,

It is unfortunate that you are incongruently conflating Sal Craparotta's right of counsel (which is not disputed by me or my client) with your ethical obligation to turn over files.

You are also disingenuously suggesting that the request for the turn over of files is coming from me, personally, without authority. As clearly stated in my original letter, the request is made by me on behalf of my client, S&J. I do not understand how this creates a conflict on my part; however, I welcome your explanation of your reasoning. On its face, your accusation, while bold, is not supported by fact or law. In any case, I am copying Joe Craparotta who is the sole manager of S&J so that he can reply to confirm the request to you.

I remind you that S&J reserves all of its rights and remedies if you continue to delay or refuse to turn over files in violation of the Michigan Rules of Professional Conduct including, without limitation, the filing of a grievance complaint with the Attorney Grievance Commission.

Sincerely,

**Nathan Upfal, P.C.**

Nathan Upfal
Attorney at Law
Of Counsel to Zausmer, P.C.

121 West Long Lake Road, Suite 200
Bloomfield Hills, Michigan 48304
Direct Dial: 248.433.2576
Cell: 248.320.8806
Fax: 248.671.0313
Email: upfal@zausmer.com
Website:
https://link.edgepilot.com/s/99cdd40c/ohhsRqLB8k62RP_aKmhlQ?
u=http://www.zausmer.com/

This communication and any attached files contain information intended for the exclusive use of the person to whom it is addressed and may contain information that is proprietary, privileged and/or confidential under applicable law. If you are not the intended recipient, please notify the sender by electronic mail or telephone and delete the original message without making any copies.  Any unauthorized viewing, copying, disclosure or distribution of this information may be subject to legal restriction and penalty.

**From:** Joe Galasso <JGalasso@galassoandassoc.com>
**Sent:** Wednesday, June 30, 2021 11:02 AM
**To:** Nathan Upfal <upfal@jackiergould.com>
**Subject:** STATUS OF THINGS

My clients need legal advice on all matters.since you will not waive conflict ,I will need to assist sal in finding a lawyer and prepping that firm.i have a holiday and medical procedure as well.your position on all issues is not  accepted.again on s&j we do not have quickbooks,joe has all the records.my clients have a right to counsel.since the request is coming from you,don't you have a conflict?

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

JOSEPH CRAPAROTTA, an individual

        Plaintiff,

vs.

SALVATORE A. CRAPAROTTA, an
individual, and SALVATORE A.
CRAPAROTTA, TRUSTEE OF THE
SALVATORE TRUST, as amended

        Defendants.

Case No. 21-002454-CB

Honorable Richard L. Caretti

_____/

MARK J. ZAUSMER (P31721)
JOHN S SHERSTON (P83183)
ZAUSMER, P.C.
Attorneys for Plaintiffs
32255 Northwestern Hwy., Ste. 225
Farmington Hills, MI 48334
(248) 851-4111
mzausmer@zausmer.com
JSherston@zausmer.com

_____/

NOTICE OF HEARING

PLEASE TAKE NOTICE that Plaintiff Joseph Craparotta's Motion for Summary

Disposition will be brought on for hearing before the Honorable Richard L. Caretti on Monday,

August 9, 2021 at 9:00 a.m., or as soon thereafter as counsel may be heard.

ZAUSMER, P.C.

_____

MARK J. ZAUSMER (P 31721)
JOHN S SHERSTON (P83183)
Attorneys for Plaintiff
32255 Northwestern Highway, Suite 225
Farmington Hills, MI  48334
(248) 851-4111

Dated:  July 14, 2021

---

### PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses as directed on the pleadings on July 14, 2021 by:

☒ E-MAIL     ☐ US MAIL     ☐ HAND DELIVERY     ☐ UPS
☐ FEDERAL EXPRESS     ☐ OTHER

*Brenda Ann Smith*
Brenda Ann Smith

---

Zausner, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

JOSEPH CRAPAROTTA, an individual

               Plaintiff,

vs.

SALVATORE A. CRAPAROTTA, an
individual, and SALVATORE A.
CRAPAROTTA, TRUSTEE OF THE
SALVATORE TRUST, as amended

               Defendants.

Case No. 21-002454-CB

Honorable Richard L. Caretti

_____/

MARK J. ZAUSMER (P31721)
JOHN S SHERSTON (P83183)
ZAUSMER, P.C.
Attorneys for Plaintiffs
32255 Northwestern Hwy., Ste. 225
Farmington Hills, MI 48334
(248) 851-4111
mzausmer@zausmer.com
JSherston@zausmer.com
_____/

**JOSEPH CRAPAROTTA'S MOTION FOR SUMMARY DISPOSITION**

Plaintiff Joseph Craparotta, through his attorneys Zausmer, P.C., moves for summary

disposition of his breach of contract claim against Defendants Salvatore A. Craparotta and

Salvatore A. Craparotta, Trustee of the Salvatore A. Craparotta Trust ("Defendants") pursuant to

MCR 2.116(C)(10). The operating agreement for S & J Cura Investments, LLC, ("the Company")

a company to which both parties are members, plainly provides: "Upon the death of Salvatore A.

Craparotta or upon him reaching age 75, Joseph Craparotta shall be the sole Manager, if he is still

active in the Company." Salvatore A. Craparotta is 76 years old and refuses to step-down and

allow Joseph to assume his role as sole Manager of the Company. Joseph Craparotta asks this

{03705287}                                          1

Court to declare he is the sole Manager of the Company per the executed operating agreement.

Joseph Craparotta relies on his brief in support of this motion.

ZAUSMER, P.C.

_____
MARK J. ZAUSMER (P 31721)
JOHN S SHERSTON (P83183)
Attorneys for Plaintiff
32255 Northwestern Highway, Suite 225
Farmington Hills, MI  48334
(248) 851-4111

Dated:  July 14, 2021

## BRIEF IN SUPPORT OF JOSEPH CRAPAROTTA'S MOTION FOR SUMMARY DISPOSITION

### Introduction

This is a simple breach of contract action to which there is no issue of fact, genuine or otherwise. There is no question of fact regarding the existence or force of the operating agreement (the "Agreement") to which Plaintiff and Defendants are parties. The relevant provision is equally clear, Defendant Salvatore A. Craparotta is the Manager of the Company until his death or until "reaching age 75." Upon the occurrence of either, "Joseph Craparotta shall be the sole Manager, if he is still active in the Company." All requirements of this provision are met: (1) Sal is 76 years old and (2) Joseph Craparotta is still active in the company.

Joseph Craparotta should not have to file this Motion and related Complaint. Per the plain terms of the Agreement, he is the sole Manager of the Company. Luckily, the Agreement also provides a provision for payment by the breaching party of cost and fees, including attorney's fees, "arising from the breach of any provision." Joseph Craparotta, therefore, seeks Defendants' payment of all of his costs and fees, including attorney's fees, associated with the litigation of this

matter in addition to seeking a declaratory judgment stating that he is the sole Manager of the Company.

## Facts

The Company is an equity Member of Cura Resource Group, LLC, a Michigan limited liability company ("Cura"). Cura is engaged in the business of warehousing and distributing third-party dietary supplements, from ten warehouse locations across the United States including Puerto Rico. The only other equity Member of Cura is Brillati Development, Inc.

Under Section 7.2 of the Agreement, "Operating decisions involving the first four locations of [Cura] shall be made by [Defendant] Salvatore A. Craparotta as Manager. Operating decisions involving locations beyond the first four locations, shall be made by [Plaintiff] Joseph Craparotta." (Section 7.2 of Exhibit 1 attached to Plt.'s Compl.) Under Section 7.2 of the Agreement of the Company, "Upon the death of Salvatore A. Craparotta or upon him reaching age 75, [Plaintiff] Joseph Craparotta shall be the sole Manager, if he is still active in the Company." *Id.*

Despite section 7.2's plain decree, Defendants have refused to recognize Joe Craparotta as Manager of the Company. Salvatore A. Craparotta is 76 years old; he turned 75 on April 14th, 2020. (See Salvatore A. Craparotta's driver's license, Ex. 2.) Plaintiff Joseph Craparotta is still active in the Company.

The agreement, further states:

> In the event of any controversy, claim or action being made, filed or instituted between the parties to this Agreement or any of the other documents related hereto or arising from the breach of any provision hereof, the prevailing party will be entitled to receive from the other party all costs, damages and expenses including attorney fees incurred by the prevailing party whether or not such controversy or claim is litigated or prosecuted to judgment.

(Ex. 1, Section 10.22.)

{03705287} 3

## Standard of Review

In evaluating a motion under MCR 2.116(C)(10), the Court should consider the pleadings, and other documentary evidence presented to determine whether there is a genuine issue of material fact. If, after evaluating all of the information in a light most favorable to the nonmoving party, the Court finds that there is no genuine issue of material fact, the motion for summary disposition should be granted.

The moving party has the initial burden of supporting its position by affidavits, depositions, admissions or other documentary evidence. *Neubacher v Globe Furniture Rentals*, 205 Mich App 418, 420 (1994). The burden then shifts to the opposing party to establish that a genuine issue of disputed fact exists. *Id.* Where the burden on a dispositive issue rests on a nonmoving party, the nonmoving party may not rely on mere allegations or denials in pleadings, but must go beyond the pleadings to set forth specific facts showing that a genuine issue of material fact exists. *McCart v J Walter Thompson*, 437 Mich 109, 115 (1991). If the opposing party fails to present documentary evidence establishing the existence of a material factual dispute, the motion is properly granted. *McCormic v Auto Club Ins Ass'n*, 202 Mich App 233, 237 (1993).

## Argument

Defendants' breach is plain. Defendants agreed that "Joseph Craparotta shall be the sole Manager" of the Company "upon [Defendant Salvatore A. Craparotta] reaching age 75." Defendant is now 76 years old. No genuine issue of fact exists in this matter whatsoever. The Agreement was signed and executed by all parties, the Agreement says what it says, Joseph is still active in the company, and there is no question of fact regarding Salvatore A. Craparotta's age or birthdate. Joseph Craparotta is entitled to summary disposition on his breach of contract claim.

**Conclusion**

Joseph Craparotta seeks a declaratory judgment stating he is the sole Manager of the Company and payment by Defendants of all costs and fees, including attorney fees, pursuant to paragraph 10.22 of the agreement. *Supra*.

ZAUSMER, P.C.

MARK J. ZAUSMER (P 31721)
JOHN S SHERSTON (P83183)
Attorneys for Plaintiff
32255 Northwestern Highway, Suite 225
Farmington Hills, MI  48334
(248) 851-4111

Dated:  July 14, 2021

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses as directed on the pleadings on July 14, 2021 by:

☒ E-MAIL   ☐ US MAIL   ☐ HAND DELIVERY   ☐ UPS
☐ FEDERAL EXPRESS   ☐ OTHER

Brenda Ann Smith

---

# EXHIBIT 1

*From 12/29/10 SIGNED*

# FIRST AMENDMENT AND RESTATEMENT OF THE
## OPERATING AGREEMENT
## FOR
## S&J CURA INVESTMENTS, LLC

### A Michigan Limited Liability Company

This First Amendment and Restatement of the Operating Agreement for S&J Cura Investments, LLC, (the " First Amendment and Restatement") is effective the 28th Day of December 2010 by the Manager(s) and Members (individually, a "Member" and collectively, the "Members")of the S&J Cura Investments, LLC, a Michigan limited liability company (the "Company") who Agree as follows:

### RECITALS

A.    As of December 31, 2007, the Manager(s) and Members made and entered into an Operating Agreement ("the Operating Agreement") of the Company.

B.    The Manager(s) and Members now wish to make changes to the Operating Agreement. Therefore, the Members and Manager(s) hereby agree to the Amendment and Restatement which shall govern their relationship and in consideration of their mutual promises, covenants and agreements the sufficiency of which is acknowledged and who hereby promise, covenant and agree as follows:

### ARTICLE I

### ORGANIZATION

**1.1    Formation.** The Company has been organized as a Michigan limited liability company under and pursuant to the Michigan Limited Liability Company Act, 1993 PA 23, as amended from time to time, (the "Act") by the filing of Articles of Organization ("Articles") with the Department of Consumer and Industry Services of the State of Michigan as required by the Act. The rights and liabilities of the Members and definitions of terms to the extent not defined here in fully, shall be determined pursuant to the Act, and Articles, the Internal Revenue Code as amended from time to time ("Code") and this Agreement. It is the expressed intention of the Members that this Operating Agreement shall be the sole source of the agreement of the parties, and, except to the extent a provision of the Operating Agreement expressly references federal tax rules by reference to a section of the Code or Regulations or is expressly prohibited or ineffective under the Act, this Operating Agreement shall govern, even if inconsistent with, or different than any provision of the Act or any other law or rule to the extent permitted. To the extent any provision of the Operating Agreement is prohibited or ineffective under the Act or the Code, this Operating Agreement shall be considered amended to the smallest degree possible in order to make the Agreement effective. In the event the Act is subsequently amended or interpreted in such a way to make any provision of this Operating Agreement that was formerly invalid valid, such provision shall be considered to be valid from the effective date of such interpretation or amendment.

1

**1.2     Name.** The name of the Company is S&J Cura Investments, LLC. The Company may also conduct its business under one or more assumed names, as the Manager(s) deem(s) appropriate in their sole discretion.

**1.3     Purpose.** The purpose of the Company is to invest in Cura Resource Group, LLC, and any related purchase, management and disposition of real and personal property. The Company shall have all the powers necessary or convenient to affect the purpose for which it is formed, including all powers granted by the Act.

**1.4     Duration.** The Company shall continue in existence in perpetuity until the Company dissolves and its affairs are would up in accordance with the Act or until a Sale (as defined in Section 9.2).

**1.5     Registered Office and Resident Agent.** The Registered Office and Resident Agent of the Company shall be as designated in the initial or amended Articles. The Registered Office or Resident Agent may be changed from time to time by the Manager. Any such change shall be made in accordance with the Act. If the Resident Agent resigns, the Manager(s)shall promptly appoint a successor.

**1.6     Intention.** The Members, as defined in Section 102(I) of the Act, intend and agree that the Company is a limited liability company and is not a partnership or other form of venture. No Member shall be construed to be a partner in the Company or of any Member, Manager or person. For federal and state income tax purposes only, the Company shall elect to be taxed as a partnership pursuant to subchapter "K" of the Code.

**1.7     Succession.** If a Manager dies, becomes bankrupt, withdraws or is removed, the successor Manager shall be appointed as provided herein.

## ARTICLE II

### BOOKS, RECORDS AND ACCOUNTING

**2.1     Books and Records.** The Company shall maintain complete and accurate books and records of the Company's business and affairs as required by the Act and such books and records shall be kept at the Company's Business Office and shall include but not be limited to: (a) a current list of Members' and Managers' names and addresses, (b) a copy of the Articles, together with any adjustments, (c) copies of the last three (3) years tax returns and books of account, (d) copy of the Operating Agreement and all Amendments, (e) records, including minutes evidencing authorization of Company action, (f) copies of records that would enable a Member to determine the relative share of distributions and voting rights, (g) copies of any Powers of Attorney, (h) copies of significant contracts  The Company upon a reasonable written request shall provide a Member access to book and records for inspection during business hours or at the Members expense copies of such books and records so long as reasonable and subject to reasonable use restrictions sell as protective orders to prevent competitive use of confidential information.

2

**2.2  Fiscal Year; Accounting.** The Company's fiscal year shall be the calendar year. The particular accounting methods and principles to be followed by the Company shall be the accrual basis for financial reporting purposes and for tax reporting purposes any method as permitted by the Code.

**2.3  Reports.** The Manager(s)with the assistance of the Members shall provide reports concerning the financial condition and results of operation of the Company and the Capital Accounts of the Members to the Members in the time, manner and form as the Manager(s) determine(s). Such reports shall be provided at least annually as soon as practicable after the end of each year and shall include a statement of each Member's shares of profits and other items of income, gain, loss, deduction and credit. The Manager(s) shall cause income tax returns to be prepared and filed with the appropriate authorities. A Member is not entitled to rely on the reports if the Member has actual knowledge that makes the reliance unwarranted.

**2.4  Member's Accounts.** The Company shall maintain separate Capital Accounts for each Member in accordance with Regulation 1.704-1(b) and all provisions regarding the establishment and a maintenance of capital accounts shall be interpreted and applied to comply with the Treasury Regulation. Each Member's Capital Account shall reflect the Member's capital contributions (at fair market value with respect to any contributed property) and increases for the Member's share of any net income or gain of the Company. Each Member's Capital Account shall also reflect decreases for distributions (at fair market value) made to the Member and the Member's share of any of the Company's losses and deductions and any expenditures under Code section 705(a)(2)(b). The Members' accounts shall reflect all adjustments as required by Section 704 of the Code and related sections and appropriate Regulations. If any or all portion of a Member's interest is transferred in accordance with this Operating Agreement, then the transferee shall succeed to the Capital Account of the transferring Member, so transferred.

**2.5  Section 754 Election.** In the event of a distribution of property made in a manner provided in Section 734 of the Code, or in the event of a transfer of any Member interest permitted by this Agreement made in the manner provided in Section 743 of the Code, the Manager, on behalf of the Company, may, but shall not be required to file an election under Section 754 of the Code in accordance with the procedures in the applicable Regulations. Such adjustments shall accounted for separately and not affect cash distribution or Member accounts described in Section 2.4

**2.6  Bank Accounts.** The Company funds shall be deposited in such bank account or accounts as designated by the Manager. The Company securities and intangible investments shall be deposited in a brokerage account or safe deposit box as designated by the Manager.

**2.7  Company Property.** Real and personal property owned or purchased by the Company shall be held and owned in the Company's name. No Member shall have any interest, right or claim to any of the Company assets.

3

**2.8     Reserves.**  The Manager(s) shall establish reserves for working capital to pay taxes, insurance, debt service, repairs, replacements or liabilities or other costs and expenses incident to the ownership or operation of the Company and for such other purposes as the Manager(s)may from time to time deem appropriate.

## ARTICLE III

## CAPITAL CONTRIBUTIONS

**3.1     Initial Commitments and Contributions.**  In exchange for the Membership interest in the Company and by the execution of this Operating Agreement, the initial Members hereby agree to make the capital contributions (money or fair market value of property) set forth in the attached Exhibit A.  The Members' interest in the total capital of the Company (the Members' "Sharing Ratios," as adjusted from time to time to reflect changes in the Capital Accounts for the Members and the total capital in the Company) are also set forth in Exhibit A.  Any additional Member (other than an assignee of a membership interest who has been admitted as a Member) shall make the capital contribution set forth in an Admission Agreement.  No interest shall accrue on any capital contribution and no Member shall have any right to withdraw or to be repaid any capital contribution except as provided in this Operating Agreement.  It is the intent of the Members that no distributions shall be a return or withdrawal of capital even if the distribution is effected by a non cash item such as depreciation.

"Capital Account" means a separate account maintained for each Member in accordance with the provisions of the Agreement and the Code. Each Members capital account shall reflect the Members capital contribution and increases for the Members share of any met income or gain. Each Member's capital account shall also reflect decreases for distributions made to the Member and the Members share of losses and deductions. In the event all or a portion of an interest is transferred pursuant to this Agreement, the transferee shall succeed to the capital account to the extent transferred.

**3.2     Additional Contribution.**  In addition to the initial capital contributions, the Manager(s)may with the consent of 80% of the Sharing Ratios, determine from time to time that additional capital contributions are needed to enable the Company to conduct its business and affairs. After making such a determination, notice of it shall be given to all Members in writing at least ten (10) business days before the date of which the additional contributions are due.  The notice shall describe, in reasonable detail, the purposes and uses of such additional capital, the amounts of additional capital required, and the date by which payment of the additional capital is due. Any Member has the right, but not the obligation to make the additional capital contributions needed according to that Member's Sharing Ratio. Failure to make additional capital contributions shall reduce that Member's Sharing Ratio and rights in the future.  If the Members failure to contribute additional capital to the Company would result in the Company's insolvency, Company's default under any existing credit facilities, or foreclosure or written threatened foreclosure of any of the Company's real or personal property in the reasonable opinion of the Manager(s), the Manager(s) shall not need Members approval.  The additional contribution shall be based on each Member's prorata interest in the Company.  The amount of the forfeiture is

4

determined by multiplying that percentage of the additional capital contribution which is not paid by the Member to the Company by the shares of the Company then owned by such Member. In the event of such forfeiture, the Member shall have no further membership rights in the Company with respect to such shares. The obligations to make additional contributions shall only for enforceable by the Members and not by creditors of any Member or any third party.

**3.3    Capital Contribution Loans by the Manager.** If any Member elects not to contribute his or her portion of any capital contribution determined by the Manager(s)to be needed by the Company, the Manager(s)may loan such amount. The Manager(s) shall be entitled to treat these amounts as an extension of credit to such non-contributing Member, payable out of any distributions which would otherwise be made to such non-contributing Member, with interest accruing on the loan at the rate of prime rate plus 1% per annum until paid, but no less than the rate equal to 120% of the applicable federal rate for short-term debt for the month the loan was made.

**3.4    Loans by the Members.** If the guarantee of the Members is required in connection with any financing provided to or for the benefit of the Company, each Member will furnish a guarantee with the amount equal to such Member's Sharing Ratio multiplied by the amount of the financing upon request and in the form requested by the Company. Upon the acceleration of any loans to the Company, then if a Member has executed a separate written guarantee such Member shall be liable for his prorata share based upon Sharing Ratios of any obligations, liabilities, judgments, causes of action, costs or expenses, including attorney fees incurred by any Member/Guarantor in connection with any failure or inability of the Company to discharge its indebtedness which was guaranteed by a Member. Each Members' obligation to pay such prorata share shall be based upon the respective Sharing Ratios and shall survive dissolutions or termination of this Agreement. If any Member pays more than such Member's prorata share, then the other Members who have executed a separate written guarantee agree to indemnify that Member for the amount in excess of such Members prorata share based upon a portion of the Nonpaying Member's prorata Sharing Ratios. Any Member may make or cause a loan to be made to the Company in any amount for business purposes. Such loans shall be on commercial terms with interest accruing at 7% per annum compounding until paid, but no less than 100% of the applicable federal rate for short-term debt for the month the loan was made. The amount of such loan shall not be treated as a contribution to capital, but shall be a debt due from the Company. While outstanding, distributions to Members shall be suspended except for taxes, as provided herein.

**3.5    Company Capital.** All Company assets will be owned by the Company and shall be in the Company name. No Member shall have any ownership interest in such property. Each Member expressly waives the right to require Company distribution of any of the Company assets or have a right of partition of any property owned by the Company. Each Member's interest shall be personal property for all purposes.

**3.6    Third Party Rights.** Nothing contained herein is intended for the benefit of any creditor or other person (other than a Member in his capacity as such) to whom the Company owes any debts, liabilities, or obligations or who otherwise has any claim against the Company, and no third party shall have any rights by virtue of the provisions herein.

**3.7    Non-Cash Capital Contributions.**  In the case of a capital contribution of non-cash property to the Company by any Member, all items of income, gain, loss, deductions and credits with respect to such contributed property, as determined for federal income tax purposes, shall be allocated among the Members to the extent necessary to take into account the difference between the fair market value (asset value) and adjusted income tax basis of the property at the time of the contribution.  Such allocation shall be made in a manner prescribed by Section 704(c) of the Code and the Regulations promulgated thereunder.

## ARTICLE IV

## ALLOCATIONS AND DISTRIBUTIONS

**4.1    Allocations.**  The Company shall elect to be treated as a partnership for tax purposes under the Code.  Except as may be required by the Code as amended or this Operating Agreement, the Company's net profits, net losses, and other items of income, gain, loss, deduction and credit shall be allocated among the Members in accordance with each Member's Sharing Ratio using any permissible method.  All profits, losses and other items and distributions shall be credited or charged, as the case may be to their Capital Accounts.  Code Sections 704 and 706 and related Regulations, as issued and amended shall be followed.  To the extent this Agreement is silent or in conflict with the Regulations, the Regulations shall control.  The Members hereby agree to be bound by the provisions of this Article IV in reporting their share of Company income and loss for income tax purposes and shall report their items consistent with the treatment of such items on the Company Tax Returns.

Should a Member's Capital Account fall below zero, for tax purposes only, all losses shall be allocated to Members with a positive Capital Account and in accordance with Sharing Ratios if more than one Member has a positive Capital Account.  Such tax losses shall be restored in profitable years to achieve the Member's Sharing Ratio.  Should no Member have a positive capital account, then losses shall be allocated to the Members in accordance with their tax basis arising from Member loans to the Company.  If no loans to the Company from the Members exist, then in accordance with the Member's share of non recourse debt.

All items of recapture under Code 1245, 1250 or other similar recapture items shall be allocated in proportion to each Member's actual share of the deduction, credit, etc. giving rise to such item of recapture.

In the event a Member unexpectedly receives an adjustment, allocation or distribution described in Reg. 1.704-1(b)2(ii)(d)(4), (5) or (6) which has not otherwise been taken into account in determining such Member's adjusted Capital Account deficit, if any, such Member shall be specially allocated items of income or gain in any amount and in such manner sufficient to eliminate, to the extent required by the Treasury Regulations under Code Sec. 704., such default as quickly as possible but only to the extent such Member does not have an obligation to restore such Member's Capital Account default.  This paragraph is interpreted to

6

constitute a "qualified income offset" under Treas. Reg. 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

Notwithstanding anything to the contrary, if during a fiscal year there is a net decrease in Company minimum gain as defined in Treas. Reg. 1.704-2(d), each Member shall be allocated items of income and gain for such year and if necessary, subsequent years in an amount equal to the greater of (1) the portion of such Member's share of the net decrease in minimum gain for the year, as determined in accordance with Treas. Reg. 1.704-2(f) that is allocable to the disposition of property subject to one or more non-recourse liabilities or (2) if such Member would otherwise have an adjusted Capital Account deficit, an amount sufficient to eliminate such deficit. This paragraph is intended to comply with the minimum gain chargeback provisions under Reg. 1.704-2(f) and should be interpreted and applied consistently therewith.

To the extent and in the manner provided by Treas. Reg. 1.704-2(i)4, if there is a net decrease in Member minimum gain, each Member with a share of Member minimum gains shall be allocated items of Company income and gain for such year and if necessary, subsequent years in an amount equal to the share of each Member in the net decrease in Member minimum gain. The items to be allocated shall be determined in accordance with Treas. Reg. 1.704-2(i)(4), (j)2. This section is intended to comply with the minimum-gain chargeback requirement of Treasury Reg. 1.704-2(i)4 and shall be interpreted consistently with it.

Any Company non-recourse deductions shall be allocated amongst the Members in accordance with Treas. Reg. 1.704-2(e).

Member non-recourse deductions shall be allocated to the Members who bear the risk of loss with respect to Member non-recourse debt to which Member non-recourse deductions are attributable in accordance with Treas. Reg. 1.704-2(i)(l).

Items of income, gain, loss and deduction with respect to any property contributed by a Member in the Company shall, solely for tax purposes be allocated amongst the Member in a way that takes into account of any variation between the adjusted basis of such property to the Company and its value for Capital Account purposes in accordance with Section 704(c) of the Code, as amended and the regulations thereunder.

Any income, gain, loss or deduction realized as a direct result or indirect result of the issuance of any interest by the Company to a Member shall be allocated amongst the Members so that, to the extent possible, the net amount together with all other allocations under this Agreement to each Member share equal to the net amount that would have been allocated to each Member if the items had not been realized.

In the event that a guaranteed payment to a Member or other payment is recharacterized for federal income tax purposes and the effect of disallowing the payment is a deduction or reduced basis in an asset, then an amount of Company gross income equal to such payment shall be allocated to the recipient of such payment. In the event that the

7

recharacterization results in a deduction, such deduction shall be allocated to the recipient of the deduction.

The Manager(s) is (are) authorized to allocate income and loss amounts to Members so as to prevent regulating allocations from distorting Company Sharing Ratios and distributions. This will be accomplished by allocations so that the net amount of regulatory allocations to each Member is zero. The Members are aware of the tax consequences of the allocations and their related economic impact and hereby agree to be bound by the provision of this Article in reporting their share of income and loss for income tax purposes.

The allocation method set forth is intended to allocate income (loss) to the Members in accordance with their actual economic interests while complying with the requirement of Code Section 704 and the Regulations promulgated thereunder. If in the opinion of the Manager, the allocations pursuant to the preceding provisions of this Article shall not satisfy the Internal Revenue Code or Regulations or account for any expenditure or transfer of an interest, then, not withstanding anything to the contrary, profits and losses shall be allocated in such a manner as the Manager(s) in its(their) reasonable and informed discretion, determines to be required so as to reflect items as the case may be and the Manager(s)shall have a right to amend this Agreement without action of the Members to properly reflect items provided. It shall not materially alter the economic agreement of the Members.

Each Member shall reflect on their income tax returns all items in a manner consistent with the treatment of such items on Company tax returns and consent to all elections made in good faith by the tax matters partner.

**4.2.1   Distributions.** The Manager(s)may make distributions to the Members from time to time in his sole and absolute discretion, provided that such distributions are in compliance with their fiduciary obligations to the Members or do not violate any creditor agreement of the Company or provision of the Act. Distributions shall mean a transfer of property or money by the Company to its Members without consideration. Distributions may be made only after the Manager(s) determine(s) in their reasonable judgment, that the Company has cash on hand exceeding the Members' loans and the Company's current and anticipated needs (including, operating expenses, debt service, acquisitions, reserves and mandatory distributions, if any). Distributions shall be made to the Members in accordance with each Member's prorata Sharing Ratios. Liquidation distributions shall be made based upon Capital Account interests. Distributions shall be in cash or property, or both, as the Manager(s) determine(s). No distribution shall be declared or made if, after giving it effect: (a) the Company would not be able to pay its debts as they become due in the usual course of business or (b) the Company's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the Company were to be dissolved at the time of the distribution, to satisfy on dissolution the preferential rights of other Members that are superior to the rights of the Members receiving the distribution. Non cash distributions shall be accounted for at the fair market value of the property at the time of the distribution.

A Member may withdraw his or her capital account only as expressly authorized by this instrument, which requires the permission of the Manager(s) in their sole and absolute

discretion. For a period of sixty (60) days only; immediately following any gratuitous addition to a Member's capital account, the Member whose capital account is increased (the Donee-member) shall have the right to withdraw an amount equal to the amount qualifying under IRC 2503(b). If the donor is married when the gift is made and the gift is eligible for gift splitting under Code section 2513(a), the amount qualifies shall be increased appropriately. No Member shall be forced to withdraw or resign from the Company prior to dissolution and winding up with our first obtaining the consent of the Manager(s) and all the other Members. A Member who withdraws in violation of this shall forfeit any and all distribution to which such Member shall be entitled to receive under this Act or Agreement This power can be exercised by a written request delivered to the Manager. The request may be made on behalf of a Donee-Member who is unable to exercise this withdrawal power because of a legal disability (including minority), by a legally authorized guardian or custodian or trustee. The Manager(s) shall promptly notify each Member of their rights but may withdrawal same in writing prior to any gratuitous addition.

A Member may withdraw his or her Capital Account only as expressly authorized by this instrument, which requires the permission of the Manager(s) in his(their) sole and absolute discretion. The Manager(s) shall distribute sufficient cash to fund the Members' federal and state income tax on their reportable share of cumulative taxable income from the Company at the highest individual rates, by April 1 of the following year provided the company has sufficient cash reserves as described in this Article.

**4.2.2   Tax Distribution.** Subject to the limitations contained in Section 4.2.1 above, the Manger shall distribute to the Members sufficient cash to fund each Members federal and state income tax obligation on their reportable share of the cumulative taxable income from the Company at the highest rates, by April 1 of the following year. Notwithstanding the preceding sentence if the Member is required to make estimated payments for federal income tax purposes, the Member may request that he Company, to the extent not already distributed, make distributions to such Member equal to one-fourth (¼) of the estimated annual distribution for such taxable year on the dates corresponding to the estimated tax payments.

**4.3   Unused.**

**4.4   Compensatory Partnership Interest.** In regard to any issuance of a capital interest or profits interest, the Company and of its Members agree to be bound irrevocably by the Liquidation Value Safe Harbor Regulations issued under Section 83 or appropriate partnership tax sections of the Code. The Company is authorized and directed to make the Liquidation Value Safe Harbor elections and the Company and all of its Members agree to comply with and be bound by all the requirements of the Liquidation Value Safe Harbor Regulations for all compensatory interest transfers to which it applies while the election remains in effect.

The Company and its Members agree to file their respective tax returns consistent with the Liquidation Value Safe Harbor provisions.

This election shall be effective the day before the compensatory interest is transferred.

**4.5    Phantom Income.** Each Member understands that taxable income and gain allocated to such Member by the Company under this Agreement and the tax on the portion there allocable to such Member hereunder for any tax year may exceed the cash distributions from the Company to such Member and such Member may have to look to sources other than distribution from the Company to pay the tax.

ARTICLE V

DISPOSITION OF MEMBERSHIP INTEREST

**5.1    General.** Every sale, assignment, transfer, exchange, gift, donation, bequest, deposit, devise, alienation, mortgage, pledge, grant, hypothecation, or other disposition, directly or indirectly, of any membership interest shall be made only in compliance with this Article. No membership interest shall be disposed of if: (a) the disposition would cause a termination of the Company under the Code; (b) the disposition would not comply with all applicable state and federal securities laws and regulations; (c) the assignee of the membership interest fails to provide the Company with the information and agreements that the Manager(s) may reasonably require in connection with such a disposition.    (d) Such disposition would substantially increase administrative costs to the company or expose the company to potential liability; (f) That such disposition will result in the imposition of fiduciary responsibility on the company, manager, member of affiliate under the Employee Retirement Income and Security Act of 1974, amended from time to time; (g) That such dispositions would result in the violation of any term or agreement to which the Company is a party or (h) the disposition would result in the acceleration of any indebtedness of the Company. Any attempted disposition of a membership interest in violation of this Article is null and void and of no force or effect.

**5.2    Permitted Transfers.** Each Member shall be permitted, voluntarily, to assign all or any portion of his or her membership interest so long as they comply with Article V.

The Assignment of a membership interest does not entitle the assignee to participate in the management and affairs of the Company or become or exercise any rights of a Member. Such assignee is only entitled to receive, to the extent assigned, the distributions to which the assigning Member would otherwise be entitled.

An Assignee of a voluntary transfer may be admitted as an additional or substitute Member if all the Members approve in writing, the Assignee adopts and agrees to be bound by the operating agreement, the Assignee releases the Company, the Manager(s) and Members from any liability to the date of their assignment, and the Manager(s) approve(s)s in its(their) sole discretion and the costs of processing and perfecting an admission including reasonable attorney fees shall be borne by the Party seeking admission.

No involuntary transfer by operation of law (bankruptcy, insolvency, creditor execution, divorce) or other involuntary assignment shall convey full Member rights and privileges. That assignment of a membership interest does not entitle the assignee to participate in the management

10

and affairs of the Company or become or exercise any rights of a Member. Such assignee is only entitled to receive, to the extent assigned, the distributions to which the assigning Member would otherwise be entitled.

Each Member hereby acknowledges the reasonableness of the restrictions on transfer in view of the Company's purposes and the relationship of the Members. Accordingly, such restriction on transfer contained herein shall be strictly enforceable.

**5.3    Death.** Each Member expressly agrees that in the event of death, or otherwise during life, he waives on behalf of himself and his estate and directs his legal representative and beneficiaries to waive the furnishing of any inventory, accounting or appraisal of the assets of the Company and any right to any audit or examination of the books. They shall be entitled to copies of any tax returns or financial statements issued for the last three years.

**5.4    Withdrawal of Members.** No Member shall have the right to withdraw from the Company without the unanimous approval of the remaining Members prior to dissolution and wind up.

**5.5    Restrictions or Transfer.**

No Member shall, gift, bequest, assign, hypothecate, mortgage, or dispose of their Member interest (each a "transfer") or any portion thereof, except as to a permitted transferee and except as determined by this Agreement. Any Transfer not in compliance with this Agreement shall be null and void and of no force or legal effect. A permitted transferee is a Trust(s) established for the benefit of parents or siblings (provided the trustee and/or successors agree in writing to be bound by all the terms and conditions of this Agreement, (ii) another member.)

Each Member acknowledges the reasonableness of the restrictions on the transfer imposed by this Agreement in view of the Company purposes, the relationship of the Members and accepts the mandatory but out and related pricing as fair and equitable.

Accordingly, the restrictions on transfers contained here in shall be specifically enforceable. Each Member hereby further agrees to hold the Company, each Member and their agents (and each Member's successor and assigns) wholly and completely harmless form any cost, liability or damage (including without limitation liability for income taxes and costs of enforcing this indemnity.) If any Member violates this Agreement it shall identify other Members and the Company for costs incurred.

**5.6    Sale of the Company.** If when Salvatore Craparotta is Manager and in his sole discretion approves or if Members holding not less than 80% of the membership interest (Sharing Ratios) approve a sale of all or substantially all of the Company's assets or a sale of all or substantially all of the Company's membership interests (whether by merger, recapitalization, consolidation, reorganization, combination, share exchange, or otherwise) to a bona fide third party (an "Approved Sale"), each Member will vote for, consent to and raise no objections against such Approved Sale. If the Approved Sale is structured as (i) a merger, consolidation, share exchange or

other transaction triggering dissenter's rights, appraisal rights or similar rights under the Act or other applicable law, then each Member will waive any dissenter's rights, appraisal rights or similar rights in connection with such merger, consolidation, share exchange or other transactions, or (ii) sale of membership interests, then each Member will agree to sell all of his/her interests and rights to acquire membership interests on the terms and conditions approved by the holders of not less than 80% of the membership interest then outstanding. Each Member will take all necessary or desirable actions in connection with the consummation of the Approved Sale as requested by the Company.

The obligations of the Members with respect to an Approved Sale of the Company are subject to satisfaction of the following conditions: (i) upon the consummation of the Approved Sale, each Member will receive the same form of consideration and the same portion of the aggregate consideration that such Members would have received in such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in Section 9.3 of this Agreement; and (ii) if any Members are given an option as to the form and amount of consideration to be received, each Member will be given the same option.

Each Member will bear their prorata share (based upon their Sharing Ratio) of the costs of any sale of membership interest pursuant to an Approved Sale to the extent such costs are incurred for the benefit of all Members and are not otherwise paid by the Company or the acquiring party. Costs incurred by a Member for their own individual benefit will not be considered costs of the transaction hereunder.

5.7     **Salvatore A. Craparotta Death.**  Upon the death of Salvatore A. Craparotta, Stephen Brillati or his Affiliate has an option to purchase a portion of the Cura Resource Group, LLC interests owned by S&J Cura Investments, LLC to achieve an overall ownership of 50% in Cura Resource Group, LLC, the "Brillati Option". If exercised, the sale proceeds and related gain shall be allocated prorata to the interests not owned by Joseph Craparotta in partial redemption of their interests.

If the full investment in Cura Resource Group, LLC is purchased, the gain shall be allocated prorata to all Members of the S&J Cura Investments, LLC.

Further, upon the death of Salvatore A. Craparotta, Joseph Craparotta, if still active in the Company and subject to the Brillati Option referenced in Section 5.7, shall have the option, if exercised within ninety (90) days, to purchase the remaining S&J Cura Investments, LLC interest not owned by Joseph Craparotta based upon the applicable percentage of the Members remaining after the Brillati Option is exercised. The Purchase Price shall be (5) times the average flow through profit of S&J from Cura Resource Group, LLC (gross before guaranteed payments) for the prior two (2) full years as presented on the tax returns, less a reduction for imputed management service fees of $200,000 times the applicable percentage. The Purchase Price shall be secured by the interests purchased and paid by means of a non-recourse non-negotiable promissory note (the "Note"). The sole security will be the Member's interest purchased and there will be no recourse to Joseph Craparotta for payment. The Note shall be payable over five (5) years or longer with annual payments, with interest at the minimum

applicable federal rate as defined in the Internal Revenue Code on the date immediately preceding the date of the exercise of this Option. The annual payment on the Note for interest and principal shall be equal to 50% of the net income applicable to the Membership Interest purchased. During this period, Joseph Craparotta would not increase his guaranteed payments for services as provided for in Section 7.15

**5.8    Unused.**

**5.9    Death of a Member Prior to Salvatore Craparotta's Death.** In the event of a death of a Member prior to Salvatore Craparotta's death their interest shall automatically be transferred to their children. In the event of no children, than the interest shall be repurchased by the remaining Members, based upon the price calculated upon the applicable prorata share of the sum of the average annual profits of the Company, S & J Cura Investments, LLC, for the preceding two (2) years multiplied by five (5) and the applicable prorata share of the book value of Cura Resource Group, LLC for the month ended before the death.

## ARTICLE VI

## MEETINGS OF MEMBERS

**6.1(a)    Voting.** All Members shall be entitled to vote on any matter submitted to a vote of the Members. The Members shall have the right to vote on all of the following: (a) the dissolution of the Company pursuant to Paragraph 9.1(c) of this Operating Agreement; (b) the merger, recapitalization, reorganization, conversion, share exchange, or interest exchange of the Company; (c) a transaction at less than fair value between a Member or Manager(s) and the Company; (d) an amendment to or restatement of the Articles of Organization or this Operating Agreement; (e) the sale, exchange, lease, or other transfer of all or substantially all of the Company's assets (except as provided in Section 5.6) and (f) a capital expenditure, acquisition of an equity interest in another business entity, borrowing, loan to a third party, assumption of debt or guarantee, indemnification in excess of $100,000; (g) appointment of a successor manager; (h) extraordinary and non usual decisions involving matters outside the ordinary course of business; (i) determining the need for additional capital contributions; (j) the sale of membership interests in lieu of sale of assets; (k) confessing of a judgment; (l) any act which would make it impossible to carry on the business of the Company; (m) any matter the Act requires expressly a vote or consent of the Members; (n) the issuance of any Membership interest to any individual or entity; (o) any appointment of a successor Manager.

**6.1(b)    Proxy Vote.** All Members hereby give their proxy to vote to Salvatore A. Craparotta on all matters during his lifetime. Upon his death this proxy shall expire.

**6.2    Required Vote.** Even if a lower percentage vote is required by the Act, the affirmative vote or consent of 80% of the Sharing Ratios of all the Members entitled to vote or consent on such matter is required on matters requiring a vote of the Members under Section 6.1 of this Agreement or otherwise. A Member with a 10% Sharing Ratio has a 10% vote, except for the

selection of an arbitration panel. Other voting requirements are provided for in their respective sections. For an example, the required vote for investment in another company or business shall be 100%.

     **6.3    Meetings.**  An annual meeting of Members for the transaction of such business as may properly come before the Meeting shall be held at such place, date, and time that the Manager(s) shall determine. Special meetings of Members for any proper purpose or purposes may be called at any time by the Manager(s) or the holders of at least 80% of the Sharing Ratios of all Members. The Company shall deliver or mail written notice stating the date, time, place and purpose(s) of any meeting to each Member entitled to vote at the meeting. The notice shall be given not less than ten (10) nor more than sixty (60) days before the meeting date. All meetings of Members shall be presided over by the Manager. Members holding at least 80% of all Member's interests shall constitute a quorum. Only Members present may vote. Without a quorum present, the meeting shall be adjourned and no business conducted at the meeting.

     A Member and/or Manger may participate in a meeting by telephone or other communication equipment.

     When any notice is required to be given to a Member, a waiver signed in writing shall be the equivalent to the giving of the notice, even if signed after the meeting.

     **6.4    Consent.**  Any action required or permitted to be taken at an annual or special meeting of the Members may be taken by consent without a meeting, prior notice, or a vote. The consent must be in writing, set forth the action so taken and be signed by the Members having at least the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all membership interests entitled to vote on the action were present and voted. Every written consent shall also bear the date upon which each Member signs the consent. Prompt notice of the taking of action without a meeting by less than unanimous written consent shall be given to all Members who did not consent in writing to the action. Failure to dissent to the Company action within ten (10) days shall be a waiver of such Members right to dissent.

     **6.5    Deadlock.**  It is the intention of the Members and Manager(s) to promote the best interest of the L.L.C. and to maintain its existence as a separate ongoing business consistent with the provisions of this Agreement. Therefore, the Members and Manager(s) shall cooperate in seeking approaches and solutions. Nevertheless, a deadlock situation may arise. As used herein, the term "deadlock" shall mean a situation of impasse where a decision that is necessary to the continuing operation of the L.L.C. and as a going business concern cannot be taken because of a failure to agree upon, by the appropriate vote. a common course of action among the Members; or the Manager(s) of the L.L.C. lacks the authority under Article VII or where the Members fail to agree by the appropriate vote on whether the L.L.C. should be dissolved. Deadlock shall not occur simply because a proposal by one Member, such as a potential customer's business or personnel retention is rejected by the others, so long as the Members or Manager(s) agree on an alternative course of action that will not result in material detriment to a Member's interest and that will assure the future ongoing existence of the L.L.C. Deadlock might occur, for example, in the event the

Members and Manager(s) disagree over the need of additional capital at some future date or over the prospects of the L.L.C. as a viable going business.

In the event of Deadlock that the Members or Manager(s) have not resolved during the thirty-day period after it arose, any Member may call a meeting of the Members and Manager(s) and Senior Management of the L.L.C., if any. If the Members and Manager(s) are unable to resolve the Deadlock at such meeting or otherwise during the ninety-day period after such Deadlock arose, then Salvatore A. Craparotta shall have the tie breaking vote if he is the Manager. If he is not the Manager then the Members and Manager(s) shall each pick one panelist for an arbitration panel and that panel shall pick an independent Member of the panel to be the third Member of the panel. In the event the members, by majority vote, cannot agree on a panelist, then a Court shall appoint same. The decision of the arbitration panel shall be binding on the parties and may be enforced in any court of competent jurisdiction.

**6.6     Property Held by joint Tenants by Entireties.**  Membership interests held by joint tenants by the entireties shall, for purposes of voting, be deemed to one half owned by each.

### ARTICLE VII

### MANAGEMENT

**7.1     Management Vested With Manager.** Subject to any power and authority which this agreement or the Act expressly vests to the Members the business and affairs of the Company shall be managed by a Manager, exclusively. The Manager(s) has (have) the power, on behalf of the Company, to do all things necessary or convenient to carry out the business and affairs of the Company. Any action taken by the Manager(s) shall constitute the act of and serve to bind the Company providing any matter requiring the vote of the Members in accord with Section 6.1 must be approved by the Members. The Manager(s) shall devote such time and effort as may reasonably be required to conduct the Company's business and perform responsibilities.

**7.2     Original Manager(s).** The ordinary and usual decisions concerning the business affairs of the Company shall be made by the alternative Managers as provided. Operating decisions involving the first four locations of Cura Resource Group, LLC shall be made by Salvatore A. Craparotta as Manager. Operating decisions involving locations beyond the first four locations, shall be made by Joseph Craparotta. Business decisions of a general nature and tax matters as set forth in Internal Revenue Code Section 6211 through 6723 and related tax elections shall be made by Salvatore A. Craparotta.

A Manager's right to manage the Company property shall not constitute a property right and is not assignable or assumable by another.

Upon the death of Salvatore A. Craparotta or upon him reaching age 75, Joseph Craparotta shall be the sole Manger, if he is still active in the Company.

If he is unavailable or unwilling to serve, as Manager, the Successor Manager shall be determined by vote of the Members based upon sharing ratios.

During a period of disability, the members shall appoint a Successor Manager to serve during the disability.

Each Member, by their execution of this Agreement, consents to the appointment of the Managers.

Joseph Craparotta acknowledges that where he acts as a Manager for Cura Resource Group, LLC decisions, that he is a Co-Manager with Stephen Brillati, as provided for in the Cura Resource Group, LLC Operating Agreement and that he will acknowledge, ratify and affirm the Cura Resource Group, LLC Operating Agreement including but not limited to the Brillati Option to purchase on-third (33⅓%) of the Company's interest in Cura Resource Group, LLC.

**7.3    Term of Office as Manager.** The Manager(s) shall have no contractual right to such position. The Manager(s) shall serve until the earlier of his or her withdrawal from the Company or his or her removal as Manager or other vacancy due to death, disability, bankruptcy or conviction of a serious crime. During such term and subject to Section 6.1, the Manager(s) shall have the power to make, execute, acknowledge and file any and all Agreements, contracts, documents, certifications and interments necessary and convenient in connection with the operation and management of the Company.

**7.4    Authority of Members to Bind the Company.** The Members agree as between themselves that only the Manager(s) and authorized agents of the Company shall have the authority to bind the Company. No Member other than the Manager(s) shall take any action as a Member to bind the Company, and each Member shall indemnify the Company for any costs or damages incurred by the Company as a result of the unauthorized action of such Member. Each Member, by executing this Agreement or a counterpart hereof, does hereby irrevocably constitute and appoint each Manager with the full power of substitution, as such Member's true and lawful attorney in fact in his name, place and stead with regard to Member-Company matters not requiring a vote of the Members. This power of attorney is coupled with an interest and is irrevocable.

**7.5    Actions of the Manager.** The Manager(s) has (have) the power to bind the Company as provided in this Article VII. The act of the Manager(s) for the purpose of apparently carrying on the business or affairs of the Company in the ordinary course, including the exercise of the authority indicated in this Article VII, shall bind the Company, and no person dealing with the Company shall have any obligation to inquire into the power or authority of the Manager(s) when he(they) is(are) acting on behalf of the Company. Further, the Manager(s) may appoint officers with limited authority or delegate day to day management to others, but with supervision.

The Manager(s) shall not have any authority to:

a.  Perform any act in violation of this Agreement or any applicable law or regulation thereunder.

b.  Do any act required to be approved or ratified by Members under the Act or this Agreement, including, without limitation, those set forth in Section 6.1.

c.  Commingle the funds of the Company with those of another person.

d.  Do any act which would make it impossible to carry on the business of the Company.

e.  Use or assign Company property other than for Company purposes.

f.  Perform, knowingly, any act that would subject the Members to unlimited liability in any jurisdiction.

g.  Invest in any other active business or company without the unanimous consent of the Members.

**7.6    Compensation of Manager.**  The Manager(s) shall be reimbursed all reasonable expenses incurred in managing the Company and shall be entitled to compensation, in an amount to be determined by Section 7.15 of this Agreement.

**7.7    Standard of Care; Liability.**  The Manager(s) shall have a fiduciary responsibility to the Members and shall discharge such duties in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances, and in a manner the Manager (s) reasonably believe(s) to be in the Company's best interests. Absent knowledge on the part of a Manager, the Manager(s) may rely on reports, information, opinions on statements prepared by Members or employees, legal or financial counsel or other professionals whom the Manager (s) reasonably believe(s) to be reliable, compliant or expert.  The Manager(s) shall not be liable for monetary damages to the Company for any breach of duties except to (a) receipt of a financial benefit to which they are not entitled; (b) voting for or assenting to a distribution to Members in violation of this Operating Agreement or the Act; or (c) a knowing violation of the law; (d) a knowing violation of the Articles or the Operating Agreement (e) knowingly doing harm to the success or continuity of the Business, (f) knowingly using assets not for the exclusive benefit of the Company, or; (g) any exercise of lack of good faith and actions constituting gross negligence, willful misconduct, fraud or bad faith.

**7.8    Removal of Manager.**  The Manager(s) may be removed as Manager by the affirmative vote of 95% of all Sharing Ratios of the Members, with or without cause.

**7.9    Additional Authority.**  The Manager(s) is(are) authorized to take all action and execute all agreements, instruments, certificates and documents in the name of and in behalf of the Company, pay expenses, open bank accounts and make filings as in his judgment necessary, proper or advisable to carry out the business purposes of the Company.

**7.10    Other Activities – Non Compete.**  Subject to the conduct of the Company's business involving dealings with Members on an arm's length basis and on reasonably commercial terms, the Manager, and Affiliate or owner of any of the Members and any Member may engage in or possess an interest in other business ventures or investments of any kind not in competition with

17

the business of the Company, as defined below, and with the restrictions herein. The fact that a Manager, any Affiliate or owner of a Member or any Member may avail itself of other opportunities either by itself or with other persons, including persons in which it has an interest, and not offer such opportunities to the Company or to the Members, shall not subject the Manager, the Member of such Affiliate and any Member to liability to the Company or to any other Member on account of lost opportunity. Neither the Company nor any Member shall have any right by virtue of this Agreement or the relationship created hereby in or to such opportunities, or to the income or profits derived therefrom, and the pursuit of such opportunities, except for those competitive with the business of the Company, and such actions shall not be deemed wrongful or improper or in violation of this Agreement. Nothing contained in this Agreement shall be construed as preventing a Member or Manager from engaging in any other business activity other than the business of the Company. As a material part of the consideration for execution of this agreement by each Member or Manager, each Member and Manager hereby waives, relinquishes and renounces any such claim or right of participation for other business and accepts the non competition provisions outlined below.

The Manager, its members and affiliates agree that the essence of this business is the provision of resources and facility management for Herbalife products or their successors or others in a similar business competitive with Herbalife or an entity to which the Cura Resource Group, LLC is providing similar services at the time. Each of the parties agree and acknowledge that a covenant not to compete is commercially reasonable and necessary to protect these assets.

Accordingly, each Manager, Member and affiliate during the period of membership, ownership or service as Manager or Member and for a period of five (5) years thereafter agrees not to a) engage or participate anywhere in the world, as an owner, partner, member, independent contractor, employee, consultant, agent, advisor or (without limitation by specific enumeration of the foregoing) otherwise in any company, enterprise, joint venture or other person or entity (each a "Competitor") which competes, directly or indirectly with the business (ii) Solicit or attempt to solicit for business of the type conducted by the Business, any person or entity who is or has been a customer, supplier, distributor, licensor, licensee or in any business relationship with the Company within the past two (2) years, or attempt to solicit or attempt to solicit such person or entity to cease doing business with or alter or limit its business relationship with the Business (iii) Take any actions which are calculated to persuade employees, independent contractors, representatives or agents of the Business to change or terminate their association with the Business or hire or otherwise retain the services of any of its employees, independent contractors (other than attorney or CPA) or agents (whether full or part-time or otherwise) who is acting in such capacity or has acted in such capacity at any time within the six (6) month period immediately preceding such proposed date of hire or retention.

Nothing contained herein shall preclude a Member from owing a passive investment of two percent (2%) or less of a public traded security.

The Company and Members recognize and agree that the territory, time and service limitations are reasonable, proper and required for the protection of the Company. If such limitations or lack thereof are deemed unreasonable by a court of competent jurisdiction, the

Company and Member agree to submit to the imposition of such limitations as said court shall deem reasonable.

**7.11    Potential Conflicts.**   The Manager(s) is(are) authorized to purchase property from, sell property to or otherwise deal with a Member or a Manager provided that the transaction shall be on terms and conditions which are no less then favorable to the company had the transaction been with an independent third party at a fair market value. Whenever possible the Manager(s) shall fully disclose to all Members all material facts relative there to and obtain the approval of a majority of disinterested Members. Should obtaining prior approval not be feasible, the Manager(s) shall seek ratification by a majority of the disinterested members after the fact. The lack of approval shall not affect the validity of the transaction *vis a vis* any unrelated third party.

**7.12    Tax Matters Partner.**      As used in this agreement the Tax Matters Partner shall have the meaning as set forth in the Code and shall have the full power and authority to act as such for the Company and Members. The duty of the Tax Matters Partner is to keep the Members informed of administrative and judicial proceedings involving tax issues relating to the Company, its property or business, this duty shall be limited to a duty to inform each Member of the beginning, completion and results of such proceedings.

The Tax Matters Partner also shall have the exclusive right, but not the obligation, to act for the Company and its Members in negotiating, settling and/or refusing to settle tax issues raised by any taxing authority with respect to any items related to the Company, its property or business, and any action taken by the Tax Matter Partner pursuant to such right shall be binding on the Company and its Members without recourse to the Tax Matter Partner. No other Member shall have the right to act for the Company or for itself or for any other Member with respect to any such tax issue. No Member shall negotiate or settle such tax issues unless and until the Tax Matter Partner shall consent thereto in writing on gives written notice that it delivers its exclusive rights to bind the Company and its Members to settle or refuse to settle a tax issue to another Member. If a Member obtains the right to negotiate or settle any such tax issues, such Member shall give prompt written confirmation thereof to the other Members and also will give written notice of the terms of any settlement.

Each Member hereby designates and appoints the Tax Matter Partner, including any person herein after so designated, as such Members true and lawful attorney in fact, with full power and authority to act in the Members name and on the Member's name and on the Members behalf in negotiating, settling on, refusing to settle any tax issues relating to the Company, its Property or its business. The foregoing Power of Attorney (and other Powers of Attorney granted here under or pursuant thereto) is a special Power of Attorney coupled with an interest , is irrevocable and shall survive the transfer or assignment by a Member of its Company interests and the death or disability of each Member or its Affiliate. At the request of the Tax Matter Partner each Member shall execute and acknowledge a separate instrument substantially similar to the foregoing provisions.

The Tax Matter Partner and their Agents shall in no event be liable for loss or damages to the Company or any Member arising out of the exercise of the rights and/or performance of their responsibilities referred to in this section. The Company or if appropriate, the

19

Members shall reimburse the Tax Matter Partner for all costs and expenses incurred by the Tax Matter Partner and shall indemnify, defend and hold harmless the Tax Matter Partner from all claim, liabilities, losses, costs and expense including but not limited to attorney fees and court costs incurred by the Tax Matter Partner in the exercise of their duties.

**7.13    No Personal Liability of Manager.**  The Manager(s) shall not be personally liable under any judgement of any court or in any manner for a debt, obligation or liability of the Company, however arising solely by reason of being a Manager

**7.14    Restrictions on Hiring Family Members.**  So long as Joseph Craparotta is a Member, the Manager(s) shall not be permitted to hire any relative (except for Salvatore or Joseph) of Salvatore Craparotta or any relative of Stephen Brillati (except for Stephen) as long as he or his affiliate is a Member of Cura Resource Group, LLC without the unanimous consent of Joseph Craparotta and Stephen Brillati. This prohibition extends to both S&J Cura Investments Group, LLC and Cura Resource Group, LLC

**7.15    Guaranteed Payments for Services.**  The Company shall make mandatory payments for services to Salvatore A. Craparotta and Joseph Craparotta for services for which payments shall be an ordinary expense in calculating net profits for the year.

For Joseph Craparotta, so long as he is working full time, not disabled or deceased, He shall be paid for services as follows:

(i)     Adequate health insurance
(ii)    45% of the tax income allocable to S&J Cura Investments, LLC from the Cura Resource Group, LLC investment earned from the first four locations.
(iii)   55% of the tax income from the other locations of Cura Resource Group, LLC allocable to S&J Cura Investments, LLC.
(iv)    Disability shall mean the inability to perform full time management functions for a period of three (3) months consistent with past performance.
(v)     Inactivity shall mean an unwillingness to perform management functions for a period of one month after receiving written notice to perform management functions consistent with past practice.

For Salvatore A. Craparotta, so long as he is living, shall be paid for current and past services as follows:

(i)     Adequate health insurance.
(ii)    Up to 45% of the taxable income allocable to S&J Cura Investments, LLC from Cura Resource Group, LLC earned from the first four locations.
(iii)   Up to 35% of the taxable income from the other locations of Cura Resource Group, LLC allocable to the S&J Cura Investments Group, LLC
(iv)    The decision as to the amounts allocate under (ii) and (iii) shall be made by Salvatore A. Craparotta.

20

(v)      Upon the death of Salvatore A. Craparotta, the 45% and 55% shares shall be cancelled and allocated to the profit for the year.

**ARTICLE VIII**

**EXCULPATION OF LIABILITY; INDEMNIFICATION**

**8.1**    **Exculpation of Liability.**  Unless otherwise provided by law or expressly assumed, a person who is a Member and/or Manager shall not be liable for the acts, debts or liabilities of the Company, except to the extent of their capital contributions, unless the Act or Agreement expressly provides otherwise.

**8.2**    **Indemnification.**

**8.2.1**  The Company shall indemnify from Company assets only to the full extent permitted by law, as the same exists or may hereafter be amended, every person acting in good faith and reasonable beliefs in the interests of the Company who was or is a party, or is threatened to be made a party, to a threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal, including actions by or in the right of the Company by reason of the fact that such person is or was a Member, Manager, employee or agent of the Company or Successor or Assigns or is or was serving at the request of the Company as a director, officer, Member, Manager, partner, trustee, employee or agent of another foreign or domestic corporation, limited liability company, partnership, joint venture, trust or other enterprise, whether for profit or not, from and against any and all losses, damages, liabilities, claims, demands and expenses, including attorneys' fees, judgments, penalties, fines and amounts paid in settlement incurred by such person in connection with the action, suit or proceeding; provided, however, that, except as provided in Section 8.2.2, the Company shall indemnify any such person seeking indemnification in connection with a proceeding ( or part of a proceeding) initiated by such person only if such proceeding (or part of a proceeding) was in connection with the Company business, in furthermore of the company's interests or because the party was a Manager or Member, but subjects to section 7.7.   The right to indemnification conferred in this Section shall be a contract right and, subject to the limitations set forth above, shall include the right, to the fullest extent permitted by law, as the same exists or may hereafter be amended, to be paid by the Company the expenses incurred in defending any such proceedings in advance of its final disposition.

**8.2.2**  If a claim under Section 8.2.1 is not paid in full by the Company within thirty (30) days after a written claim has been received by the Company the claimant may at any time thereafter  bring suit against the Company to recover the unpaid amount of the claim and, if successful in whole or in part, the claimant shall be entitled to be paid also the expense of prosecuting such claim including reasonable attorney fees.  It shall be a defense to any such action (other than an action brought to enforce a claim for expenses incurred in defending any proceeding in advance of its final disposition where the required undertaking, if any is required, has been rendered to the Company) that the claimant has not met the standards of conduct which make it permissible under applicable law for the Company to indemnify the claimant for the amount

21

claimed, or failed to meet the standards of conduct under Section 7.7, but the burden of proving such defense shall be on the Company. Neither the failure of the Company (including its Members or its independent legal counsel) to have made a determination prior to the commencement of such action that indemnification of the claimant is proper in the circumstances because he or she has met the applicable standard of conduct set forth by applicable law or Section 7.7, nor an actual determination by the Company (including its Members or its independent legal counsel) that the claimant has not met such applicable standard of conduct, shall be a defense to the action or create a presumption that the claimant has not met the applicable standard of conduct.

8.2.3 The Company shall have power, to the extent now or hereafter provided by law, to purchase and maintain insurance on behalf of any person who is or was a Member, Manager, employee or agent of the Company, or is or was serving at the request of the Corporation as a director, officer, Member, Manager, partner, trustee, employee or agent of another corporation, limited liability company, partnership, joint venture, trust or other enterprise against any liability asserted against such person and incurred by such person in any such capacity, or arising out of such person's status as such.

## ARTICLE IX

## DISSOLUTION AND WINDING UP

9.1    **Dissolution.**  The Company shall dissolve and its affairs shall be would up on the first to occur of the following events:  (a) upon the happening of a Sale (as defined in Section 9.2); (b) by the consent of all of the Members; (c) any other event which under the Act or otherwise as provided by law causes the dissolution and termination of the Company or (d) an event that makes it unlawful or impossible to carry on the business of the Company.

9.2    **Dissolution Upon Sale.**  Without any further act or deed by the Members or the Manager, the Company shall automatically dissolve and its affairs shall be would up upon the consummation of a Sale.  For the purposes of this Operating Agreement, a "Sale" shall mean: (1) an initial public offering of equity securities if they constituted greater than 80% in value of the assets, pursuant to a registration statement which has been filed and become effective under the Securities Act of 1933; (2) a merger or consolidation of equity securities with or into another entity, in which the L.L.C. equity security is not the surviving entity or the Members of the equity company prior to such merger or consolidation do not own a majority of the voting securities of the surviving entity; or (3) a sale of all or substantially all of the assets to a third party.

9.3    **Winding Up.**  On dissolution, the Company shall cease carrying on its business and affairs and shall begin winding them up.  The Company shall complete the winding up as soon as practicable.  Upon the winding up of the Company, its assets shall be distributed first to creditors to the extent required by law, in satisfaction of Company debts, liabilities and obligations and then to Members.  Distributions to Members shall be made first to correct any imbalances in the Members' Capital Accounts and then in accordance with the Members' Sharing Ratios.  In no event shall a distribution cause a Member's Capital Account to fall below a positive amount.  The proceeds shall be paid to the Members within 90 days after the date of winding up.

Upon dissolution of the Company, the Manager(s) shall act as a Liquidator of the Company. The Members also hereby appoint the Manager(s) as their true and lawful attorney in fact for this purpose. The Liquidator shall, with reasonable speed, wind up the affairs of the Company and liquidate the property assets. The Liquidator shall use reasonable commercial discretion to determine the time, manner and terms of sale of any property, have due regard to the activity and condition of the relevant market and general financial and economic conditions. The Liquidator shall promptly distribute the proceeds of the liquidation in accordance with the terms and conditions of this Section 9.3.

The Members shall look solely to the Company's property for the return of the capital contributions or capital accounts and if the Company's property after payment of debts and liabilities is insufficient, no Member shall have recourse against the Manager except as provided in section 7.7 or against any Member.

**9.4    Continuation of Company After Disassociation.**   Notwithstanding the death, withdrawal, expulsion, bankruptcy or dissolution of a Member or the occurrence of any other event that terminates the continued membership of a Member in the Company, the business and affairs of the Company may continue if, within 90 days, a majority of the remaining Members vote to continue the existence of the Company

**9.5    No Obligation to Restore Deficit Balances.** If any Member has a deficit balance in such Members capital account, at any time, such Members shall have no obligation to make any contribution to the capital of the Company and such deficit shall not be considered a debt owed to the Company or to any person for any purpose whatsoever.

## ARTICLE X

## GENERAL PROVISIONS

**10.1    Terms.**  Nouns and pronouns will be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the person or persons, firm, or corporation may in the context require. Person means any individual, partnership, corporation, limited liability company, trust, estate, qualified plan or other entity.

**10.2    Article Headings.**  The Article headings contained in the Operating Agreement have been inserted only as a matter of convenience and for reference, and in no way shall be construed to define, limit or describe the scope or intent of any provision of this Operating Agreement.

**10.3    Counterparts.** This Operating Agreement may be executed in several counterparts, each of which will be deemed an original but all of which will constitute one and the same agreement. Copies (whether facsimile, photostatic, or otherwise) of this agreement and its signatures shall be deemed to be only originals and may be relied upon to the same extent as the originals.

23

**10.4    Entire Agreement.**   This Operating Agreement contains the entire agreement among the parties with respect to its subject matter and supersedes any and all other agreements, either oral or written, between the parties with respect to such subject matter. The parties have made independent investigations of the Company and acknowledge that no representations or agreements other then set forth there in have been made with respect thereto.

**10.5    Severability.**  The parties to this Operating Agreement expressly agree that it is not their intent to violate any public policy, statutory or common law rule, regulation, or decision of any governmental or regulatory body.  If any provision of this Operating Agreement is judicially or administratively interpreted or construed to be in violation of any such policy, rule, regulation, or decision, the provision causing such violation will be inoperative (and in lieu thereof there will be inserted such provision as may be valid and consistent with the intent of the parties under this Operating Agreement) and the remainder of this Operating Agreement, as amended, will remain binding upon the parties, unless the inoperative provision would cause enforcement of the remainder of this Operating Agreement to be inequitable under the circumstances.

**10.6    Amendment.**  This Operating Agreement may be amended or revoked at any time by a written agreement executed by all of the parties to this Operating Agreement.  No change or modification to this Operating Agreement shall be valid unless in writing and signed by the required vote of the parties to this Operating Agreement.

**10.7    Notices.**  Any notice permitted or required under this Operating Agreement shall be conveyed to the party at the address reflected in this Operating Agreement and will be deemed to have been given when deposited in the United States mail, postage paid, or when delivered in person, or by courier or by facsimile transaction.

**10.8    Binding Effect.**  Subject to the provisions of this Operating Agreement relating to transferability, this Operating Agreement shall be binding on and shall inure to the benefit of the parties, and their respective distributees, heirs, successors and assigns.

**10.9    Governing Law.**  This Operating Agreement is being executed and delivered in the State of Michigan and shall be governed by, construed and enforced in accordance with the laws of the State of Michigan without giving effect to any conflicts of law rules.  Each Member consents and submits to the personal jurisdiction of any state or federal court within Michigan, waives the right to change the venue of litigation and agrees to service of process by mail.

**10.10  Successors and Assigns.**  This Agreement and all the terms and provisions hereof shall be binding upon and shall inure to the benefit of the Members and their respective heirs, executors, administrators, successors and permitted assigns.  Any person acquiring or claiming an interest in the Company, in any manner whatsoever, shall be subject to and bound by all the terms, conditions and obligations of this Agreement to which his predecessor in interest was subject or bound, without regard to whether such person has executed this Agreement or a counterpart hereof or any other documents contemplated hereby.  No person shall have any rights or obligations relating to the Company greater than those set forth in the Agreement, and no person shall acquire

24

an interest in the Company or become a Member thereof except as permitted by the terms of this Agreement.

**10.11   Additional Assurances.**  Upon the request of the Manager, each Member agrees to perform all further acts and execute, acknowledge and deliver any documents which the Manager (s) deem(s) reasonably necessary to effectuate the provision of this Agreement.

**10.12   Partition.**  Each of the parties hereto irrevocably waives during the term of the Company any right that he may have to maintain any action for partition with respect to Company Property or cause any sale of Company property.

**10.13   No Waiver.**  Failure or delay of any party in exercising any right or remedy under this Agreement, or any other agreement between the parties, or otherwise, will not operate as a waiver thereof.  The express waiver by any party of a breach of any provision of this Agreement by any other party shall not operate or be construed as a waiver of any subsequent breach by said party.  No waiver will be effective unless and until it is in written form and signed by the waiving party.

**10.14   No Third Party Rights.**  This Agreement and the covenants and agreements contained herein are solely for the benefit of the parties hereto and their Affiliates.  No other person, including creditors, shall be entitled to enforce or make any claims, or have any rights pursuant to the provisions of this Agreement.

**10.15   Affiliate.**  For purposes of this Agreement, Affiliate shall mean any person, entity, officer, shareholder, partner or Member that directly or indirectly through one or more intermediaries has a 20% interest of value or voting control or is under common control in or by a Member or Members; as well as officers, shareholders, partners or members of a Member.  It also includes spouses and legal descendants as provided by Section 269 of the Code.  For purposes of this definition, the term "controls," "is controlled by," or "is under common contact with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and polices of a person or entity , whether through its ownership of voting securities by contract or otherwise.

**10.16   Registration.**  The Members acknowledge that the membership interest have not been registered under the federal or state security laws in reliance on exemptions.  The Members hereby covenant and represent that they are acquiring their interests solely for investment purposes and not with a view to distribution.  Each Member indemnifies the Company and other Members for such a breach.

**10.17   Confidentiality.**  As an inducement for the Company and its Members to enter into this Agreement, each of the Members agrees that for the longest period permitted by law, the Members shall and shall cause their affiliates to maintain all confidential information in confidence and not disclose to anyone outside of the Company and shall not use any confidential information for their benefit or the benefit of any third party except as provided for in a written agreement, except to the extent as required by law.

Confidential Information means information regarding the Business to the extent it is confidential, including, but limited to (i) its operations and financial condition, (ii) pricing, sales, marketing, capital expenditures, costs, alliances, (iii) employees, sales representatives including identity, responsibilities, competences and compensation, (iv) customer lists, current and prospective, customers' identities, contact persons and purchasing patterns, (v) forecasts, business plans, (vi) trade secrets and proprietary information (vii) software code, program source documents, (viii) technical information, patent and copyright applications, drawings, models, know-how, discoveries, inventing, improvements, technique, methods, algorithms, designs and (ix) website designs and content.

For purposes of this Section Business means the operations of Cura Resource Group, LLC., its operations and Confidential means not available to the public or though legal means.

**10.18  Conflicts of Interest.**  EACH MEMBER AND MANAGER ACKNOWLEDGES THAT IT HAS BEEN ADVISED THAT A POTENTIAL CONFLICT OF INTEREST EXISTS AMONG THEIR INDIVIDUAL INTERESTS AND THAT BY EXECUTION HEREOF, ACKNOWLEDGES THAT THEY HAVE BEEN ADVISED TO SEEK INDEPENDENT LEGAL, TAX AND FINANCIAL COUNSEL AND HAS HAD THE OPPORTUNITY TO DO SO AND WILL DO SO REGARDING ALL FUTURE MATTERS. Each Member, Manager, party or Affiliate has had all information necessary or will seek such information via a written agreement to make an informed decision with regard to this Agreement or operation of the Company and that any claims regarding any possible conflict against Joseph P. Galasso or any of his affiliates with regard to this Agreement, the Company or the preparation, or operation of the Agreement or the Company are freely and voluntarily waived.

**10.19  Member Relationship.**  Nothing in this Agreement shall be interpreted or construed to constitute any Member as the agent of any other Member or except as expressly provided in this Agreement, to restrict Members from carrying on their respective businesses or activities.

**10.20  Further Action.**  Each Member agrees to perform all further acts and execute, acknowledge and deliver any documents which may be reasonably necessary, appropriate or desirable to carry out the provisions of this Agreement.

**10.21  Specific performance and Damages.**  The Members understand and agree that any Member may suffer irreparable damage in the event this Agreement is not specifically performed according to its terms. Accordingly, the Members agree that all the terms of this Agreement shall be enforceable in a court having equity jurisdiction by a decree of specific performance or by injunction or both, provided, however, the foregoing shall not be construed as prohibiting any of the Members from pursuing any additional remedies for a breach or threatened breach of this Agreement including the recovery of damages, consequential damages or lost profits. Each and every right, remedy and power hereby granted to any party or allowed by law shall be cumulative and not exclusive of any other.

26

Payment of any damages under this clause shall not affect the right of the non-breaching parties to enforce this clause against the other Members if necessary through legal action.

**10.22   Attorney Fees.**  In the event of any controversy, claim or action being made, filed or instituted between the parties to this Agreement or any of the other documents related hereto or arising from the breach of any provision hereof, the prevailing party will be entitled to receive from the other party all costs, damages and expenses including attorney fees incurred by the prevailing party whether or not such controversy or claim is litigated or prosecuted to judgment.

**10.23   Incorporation by Reference.**  Each exhibit or schedule attached and referred to in this Agreement is hereby incorporated herein.

**10.24   Code and Regulation Usage.**  Code means the Internal Revenue Code of 1986 as amended from time to time.  Regulations means Federal Income Tax Regulations promulgated under the Code.  Unless otherwise defined, terms used herein shall have the meaning provided by the Code and Regulations.

**10.25   Profits and Losses.**  Profits and losses for any fiscal year or other period means the amount equal to the Company's taxable income for federal income tax purposes for such year or period determined in accordance with the Code under Section 703(a) and the Regulations thereunder with the following adjustments:

(i)     All items of income, gain, loss and deduction required to be separately stated shall be included in taxable income.

(ii)    Income exempt from federal income tax shall be treated as income and expense not deductible shall be treated as expense.

(iii)   Expenditures described in Section 705(a)(2)(B) or treated as expenditures under Regulation 1.704-1(b)(2)(iv)(i) shall be subtracted.

(iv)    Gain or loss resulting from the disposition of property recognized for federal income taxes and depreciation shall be determined with reference to asset value.  Asset value means as to any Company asset (a) the fair market value when contributed by a Member (b) the fair market value on the date of distribution to a Member or (c) gains in the asset unless otherwise provided by the Code.

"Regulations" means income tax regulations, including temporary regulations, promulgated under the code, as such regulations may be amended form time to time including corresponding provisions of succeeding regulations.

**10.26   Fiduciary Duty.**  Each Member and Manager acknowledges that it has a fiduciary duty to the Company except as modified herein.

27

**10.27  Warranty and Representation as to Power.**   Each Manager and Member represents and warrants that it has the power and authority to execute and comply with the terms of this Agreement and such execution is not in contravention of any other agreement or contract.

**10.28  Assurance of Return.**  No assurance can be given that the investment objection of the Company can be achieved. This Agreement is in the best interests of the Company and its Members, even though restrictions herein may affect the value and that each Member may have disadvantages and each party acknowledged this expressly by their signature below.

**10.28  Computation of Accountants.**  Except as to matters as to which the Manager(s) is(are) granted discretion under this Agreement, the opinion of the CPA retained by the Company from time to time shall be binding and final with respect to all computations or determinations or allocations made  under this Agreement, absent manifest error.

**[Signature page follows]**

28

**OPERATING AGREEMENT**
**FOR**
**S&J CURA INVESTMENTS, LLC**

**[Signature Page]**

**IN WITNESS WHEREOF,** The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

**THE COMPANY MANAGER:**

_____     _____
Witness                                                  Salvatore A. Craparotta

_____     _____
Witness                                                  Joseph Craparotta

**MEMBERS:**

_____     _____
Witness                                                  Salvatore A. Craparotta, Trustee of the
                                                                    Salvatore A. Craparotta Trust as amended

_____     _____
Witness                                                  Joseph Craparotta

_____     _____
Witness                                                  Steven Craparotta

_____     _____
Witness                                                  Anne Michaels

_____     _____
Witness                                                  Anette Craparotta

29

# OPERATING AGREEMENT
## FOR
## S&J CURA INVESTMENTS, LLC

### [Signature Page]

**IN WITNESS WHEREOF,** The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

### THE COMPANY MANAGER:

| | |
|---|---|
| Witness | Salvatore A. Craparotta |
| Witness | Joseph Craparotta |

### MEMBERS:

| | |
|---|---|
| Witness | Salvatore A. Craparotta, Trustee of the Salvatore A. Craparotta Trust as amended |
| Witness | Joseph Craparotta |
| Witness | Steven Craparotta |
| Witness | Anne Michaels |
| Witness | Anette Craparotta |

29

OPERATING AGREEMENT
FOR
S&J CURA INVESTMENTS, LLC

[Signature Page]

IN WITNESS WHEREOF, The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

THE COMPANY MANAGER:

_____           _____
Witness                                    Salvatore A. Craparotta

_____           _____
Witness                                    Joseph Craparotta

MEMBERS:

_____           _____
Witness                                    Salvatore A. Craparotta, Trustee of the
                                           Salvatore A. Craparotta Trust as amended

_____           _____
Witness                                    Joseph Craparotta

_____           _____
Witness                                    Steven Craparotta

_____           _____
Witness                                    Anne Michaels

_____           _____
Witness                                    Anette Craparotta

29

01/04/2011  14:04   1586789:4818           SOUTH RIVER MAR        PAGE  01/01

# OPERATING AGREEMENT
## FOR
## S&J CURA INVESTMENTS, LLC

### [Signature Page]

**IN WITNESS WHEREOF,** The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

### THE COMPANY MANAGER:

| | |
|---|---|
| _____ | _____ |
| Witness | Salvatore A. Craparotta |
| _____ | _____ |
| Witness | Joseph Craparotta |

### MEMBERS:

| | |
|---|---|
| _____ | _____ |
| Witness | Salvatore A. Craparotta, Trustee of the Salvatore A. Craparotta Trust as amended |
| _____ | _____ |
| Witness | Joseph Craparotta |
| _____ | _____ |
| Witness | Steven Craparotta |
| _____ | _____ |
| Witness | Anne Michaels |
| _____ | _____ |
| Witness | Anette Craparotta |

29

EXHIBIT A

## OPERATING AGREEMENT
## FOR
## S&J CURA INVESTMENTS, LLC

| Member Name and Address | Capital Contribution | Interest in Capital | Sharing Ratio |
|---|---|---|---|
| Joseph Craparotta<br>1063 Sunningdale<br>Grosse Pointe Woods, Michigan 48236 | $ 33.30 | 33.3% | 33.3% |
| Steven Craparotta<br>623 Rivard<br>Grosse Pointe, Michigan  48230 | 22.00 | 22.0% | 22.0% |
| Anne Michaels<br>274 Mt Vernon<br>Grosse Pointe Farms, Michigan 4 8236 | 22.00 | 22.0% | 22.0% |
| Anette Craparotta<br>5019 Groveland Terrace<br>Naples, Florida  34119 | 22.00 | 22.0% | 22.0% |
| Salvatore A. Craparotta, Trustee of the<br>Salvatore A. Craparotta Trust as amended<br>5019 Groveland Terrace<br>Naples, Florida  34119 | 0.70 | 0.70% | 0.7% |
| | $100.00 | | |

30

# OPERATING AGREEMENT
## FOR
## S&J CURA INVESTMENTS, LLC

### [Signature Page]

**IN WITNESS WHEREOF,** The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

**THE COMPANY MANAGER:**

_____
Witness

_____
Salvatore A. Craparotta

_____
Witness

_____
Joseph Craparotta

**MEMBERS:**

_____
Witness

_____
Salvatore A. Craparotta, Trustee of the
Salvatore A. Craparotta Trust as amended

_____
Witness

_____
Joseph Craparotta

_____
Witness

_____
Steven Craparotta

_____
Witness

_____
Anne Michaels

_____
Witness

_____
Anette Craparotta

29

## OPERATING AGREEMENT
## FOR
## S&J CURA INVESTMENTS, LLC

### [Signature Page]

**IN WITNESS WHEREOF,** The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

**THE COMPANY MANAGER:**

_____
Witness

_____
Salvatore A. Craparotta

_____
Witness

_____
Joseph Craparotta

**MEMBERS:**

_____
Witness

_____
Salvatore A. Craparotta, Trustee of the
Salvatore A. Craparotta Trust as amended

_____
Witness

_____
Joseph Craparotta

_____
Witness

_____
Steven Craparotta

_____
Witness

_____
Anne Michaels

_____
Witness

_____
Anette Craparotta

29

OPERATING AGREEMENT
FOR
S&J CURA INVESTMENTS, LLC

[Signature Page]

IN WITNESS WHEREOF, The parties have executed this Operating Agreement and agree to be bound thereby, effective on the date listed on the first page of this Operating Agreement.

THE COMPANY MANAGER:

Witness _____

Witness _____

Salvatore A. Craparotta _____

Joseph Craparotta _____

MEMBERS:

Witness _____

Witness _____

Salvatore A. Craparotta, Trustee of the
Salvatore A. Craparotta Trust as amended _____

Joseph Craparotta _____

Witness _____

Steven Craparotta _____

Witness _____

Anne Michaels _____

Witness _____

Anette Craparotta _____

29

# EXHIBIT 2

{01938860}



FILED by Macomb County Circuit Court
7/20/2021 8:03:42 AM
Service, Submitted, and File

21-cv-11913-SFC-CI   ECF No. 1, PageID.115   Filed 08/18/21   Page 115 of 125

2021-002454-CB
CRAPAROTTA, JOSE

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

JOSEPH CRAPAROTTA, an individual

        Plaintiff,

vs.

SALVATORE A. CRAPAROTTA, an
individual, and SALVATORE A.
CRAPAROTTA, TRUSTEE OF THE
SALVATORE TRUST, as amended

        Defendants.

_____/

Case No. 21-002454-CB

Honorable Richard L. Caretti

MARK J. ZAUSMER (P31721)
JOHN S SHERSTON (P83183)
ZAUSMER, P.C.
Attorneys for Plaintiffs
32255 Northwestern Hwy., Ste. 225
Farmington Hills, MI 48334
(248) 851-4111
mzausmer@zausmer.com
JSherston@zausmer.com

_____/

RENOTICE OF HEARING

PLEASE TAKE NOTICE that Plaintiff Joseph Craparotta's Motion for Summary

Disposition will be brought on for hearing before the Honorable Richard L. Caretti on Monday,

August 30, 2021 at 9:00 a.m., or as soon thereafter as counsel may be heard.

ZAUSMER, P.C.

_____

MARK J. ZAUSMER (P 31721)
JOHN S SHERSTON (P83183)
Attorneys for Plaintiff
32255 Northwestern Highway, Suite 225
Farmington Hills, MI  48334
(248) 851-4111

{03718670}

Dated:  July 20, 2021

---

### PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses as directed on the pleadings on July 20, 2021 by:

☐ E-MAIL     ☒ US MAIL     ☐ HAND DELIVERY     ☐ UPS
☐ FEDERAL EXPRESS     ☐ OTHER

*Brenda Ann Smith*
Brenda Ann Smith

---

Zausmer, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

JOSEPH CRAPAROTTA, an individual,

       Plaintiff,

v.

SALVATORE A. CRAPAROTTA, an
individual, and SALVATORE A.
CRAPAROTTA, TRUSTEE OF THE
SALVATORE TRUST, as amended,

       Defendants.

Case No. 21-002454-CB

Hon. Richard L. Caretti

---

| ZAUSMER, P.C. | DYKEMA GOSSETT PLLC |
|---|---|
| Mark J. Zausmer (P31721) | Thomas M. Schehr (P54391) |
| John S. Sherston (P83183) | Andrew J. Kolozsvary (P68885) |
| *Attorneys for Plaintiff* | *Attorneys for Defendants* |
| 32255 Northwestern Hwy., Ste. 225 | 400 Renaissance Center |
| Farmington Hills, MI 48334 | Detroit, MI 48243 |
| (248) 851-4111 | (313) 568-6800 |
| mzausmer@zausmer.com | tschehr@dykema.com |
| jsherston@zausmer.com | akolozsvary@dykema.com |

---

## **NOTICE OF APPEARANCE**

       PLEASE ENTER the appearance of Thomas M. Schehr of Dykema Gossett PLLC, as

counsel of record appearing on behalf of Defendants Salvatore A. Craparotta and Salvatore A.

Craparotta, Trustee of the Salvatore Trust, as amended, in the above matter.

       DYKEMA GOSSETT PLLC

       By: */s/Thomas M. Schehr* _____
          Thomas M. Schehr (P54391)
          Andrew J. Kolozsvary (P68885)
          *Attorneys for Defendants*
          400 Renaissance Center
          Detroit, MI 48243
          (313) 568-6800
          tschehr@dykema.com
          akolozsvary@dykema.com

Date:  July 28, 2021

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 28, 2021, I electronically filed the foregoing paper with the Clerk of the Court using the MiFile system which will provide notification to all counsel of record.

DYKEMA GOSSETT PLLC

By: */s/Thomas M. Schehr*
Thomas M. Schehr (P54391)
Andrew J. Kolozsvary (P68885)
*Attorneys for Defendants*
400 Renaissance Center
Detroit, MI 48243
(313) 568-6800
tschehr@dykema.com
akolozsvary@dykema.com

121813.000001
4848-8665-0612.1

FILED by Macomb County Circuit Court
7/28/2021 4:57:00 PM
Service, Submitted, and File

Case 2:21-cv-11913-SFC-CI   ECF No. 1, PageID.119   Filed 08/18/21   Page 119 of 125

2021-002454-CB
CRAPAROTTA, JOSE

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

JOSEPH CRAPAROTTA, an individual,

Plaintiff,

v.

SALVATORE A. CRAPAROTTA, an
individual, and SALVATORE A.
CRAPAROTTA, TRUSTEE OF THE
SALVATORE TRUST, as amended,

Defendants.

Case No. 21-002454-CB

Hon. Richard L. Caretti

---

| ZAUSMER, P.C. | DYKEMA GOSSETT PLLC |
|---|---|
| Mark J. Zausmer (P31721) | Thomas M. Schehr (P54391) |
| John S. Sherston (P83183) | Andrew J. Kolozsvary (P68885) |
| *Attorneys for Plaintiff* | *Attorneys for Defendants* |
| 32255 Northwestern Hwy., Ste. 225 | 400 Renaissance Center |
| Farmington Hills, MI 48334 | Detroit, MI 48243 |
| (248) 851-4111 | (313) 568-6800 |
| mzausmer@zausmer.com | tschehr@dykema.com |
| jsherston@zausmer.com | akolozsvary@dykema.com |

---

## NOTICE OF APPEARANCE

PLEASE ENTER the appearance of Andrew J. Kolozsvary of Dykema Gossett PLLC, as

counsel of record appearing on behalf of Defendants Salvatore A. Craparotta and Salvatore A.

Craparotta, Trustee of the Salvatore Trust, as amended, in the above matter.

DYKEMA GOSSETT PLLC

By: */s/Andrew J. Kolozsvary*
Thomas M. Schehr (P54391)
Andrew J. Kolozsvary (P68885)
*Attorneys for Defendants*
400 Renaissance Center
Detroit, MI 48243
(313) 568-6800
tschehr@dykema.com
akolozsvary@dykema.com

Date:  July 28, 2021

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2021, I electronically filed the foregoing paper with the Clerk of the Court using the MiFile system which will provide notification to all counsel of record.

DYKEMA GOSSETT PLLC


By: */s/Andrew J. Kolozsvary*_____
Thomas M. Schehr (P54391)
Andrew J. Kolozsvary (P68885)
*Attorneys for Defendants*
400 Renaissance Center
Detroit, MI 48243
(313) 568-6800
tschehr@dykema.com
akolozsvary@dykema.com

121813.000001
4820-4258-5844.1

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

JOSEPH CRAPAROTTA, an individual,

    Plaintiff,                             Case No. 21-002454-CB

-v-                                       Honorable Richard L. Caretti

SALVATORE A. CRAPAROTTA, an
Individual, and SALVATORE A.
CRAPAROTTA, TRUSTEE OF THE
SALVATORE TRUST, as amended,

    Defendants.

_____/

| MARK J. ZAUSMER (P31721) | THOMAS M. SCHEHR (P54391) |
|---|---|
| JOHN S. SHERSTON (P83183) | ANDREW J. KOLOZSVARY (P68885) |
| Zausmer, P.C. | Attorneys for Defendants |
| Attorneys for Plaintiff | 400 Renaissance Center |
| 32255 Northwestern Highway, Suite 225 | Detroit, MI 48243 |
| Farmington Hills, MI 48334 | (313) 568-6800 |
| (248) 851-4111; Fax: (248) 851-0100 | tschehr@dykema.com |
| mzausmer@zausmer.com | akolozsvary@dykema.com |
| jsherston@zausmer.com | |

_____/

# APPEARANCE

TO:    Clerk of the Court

    NOW COMES John S. Sherston of Zausmer, P.C., and hereby enters his Appearance as

co-counsel on behalf of Plaintiffs, JOSEPH CRAPAROTTA and BRILLATI DEVELOPMENT,

INC., in the above-referenced matter.

                       ZAUSMER, P.C.

                       */s/John S. Sherston*

                       _____
                       JOHN S. SHERSTON (p83183)
                       Attorney for Plaintiffs

Zausmer, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

Document received by the MI Macomb 16th Circuit Court.

32255 Northwestern Highway, Suite 225
Farmington Hills, MI  48334
(248) 851-4111

Dated:  August 2, 2021

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses as directed on the pleadings on August 2, 2021 by:

☒ E-FILE ☐ US MAIL ☐ HAND DELIVERY ☐ UPS ☐ FEDERAL EXPRESS ☐ OTHER

*/s/Brenda Ann Smith*
Brenda Ann Smith

Zausmer, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

Document received by the MI Macomb 16th Circuit Court.

{03743502}

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF MACOMB

JOSEPH CRAPAROTTA, an individual

               Plaintiff,

vs.

SALVATORE A. CRAPAROTTA, an
individual, and SALVATORE A.
CRAPAROTTA, TRUSTEE OF THE
SALVATORE TRUST, as amended

               Defendants.

Case No. 21-002454-CB

Honorable Richard L. Caretti

_____/

| | |
|---|---|
| MARK J. ZAUSMER (P31721) | THOMAS M. SCHEHR (P54391) |
| JOHN S SHERSTON (P83183) | ANDREW J. KOLOZSVARY (P68885) |
| Zausmer, P.C. | Dykema Gossett PLLC |
| Attorneys for Plaintiffs | Attorneys for Defendants |
| 32255 Northwestern Hwy., Ste. 225 | 400 Renaissance Center |
| Farmington Hills, MI 48334 | Detroit, MI 48243 |
| (248) 851-4111 | (313) 568-6800 |
| mzausmer@zausmer.com | tschehr@dykema.com |
| JSherston@zausmer.com | akolozsvary@dykema.com |

_____/

**JOSEPH CRAPAROTTA'S MOTION FOR
EARLY SCHEDULING CONFERENCE**

    Joseph Craparotta, by his attorneys Zausmer, P.C., requests this Court conduct an

early scheduling conference, pursuant to Michigan Court Rule 2.401(B), on the date

noticed and filed along with this motion, **Monday, August 23, 2021**. Mr. Craparotta also

seeks an expedited scheduling order to address urgent matters that have arisen in this

litigation.

    Defendant has taken steps that threaten to alter the status quo of S & J Cura

Investments, LLC and Cura Resource Group, LLC. Defendant purportedly removed Mr.

Zausmer, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

Document received by the MI-Macomb 16th Circuit Court.

{03759345}

Craparotta as the Manager of S & J and a Manager of Cura. Defendant purportedly appointed his son Steve Craparotta to both positions. Steve Craparotta is not active in either business, therefore, this purported action is plainly not in the best interest of either LLC. While Defendant's actions violate the respective operating agreements governing S & J and Cura, an expedited scheduling order, specifically expedited discovery, will aid Mr. Craparotta in determining if he will need to request a receivership to preserve the status quo of S & J.

ZAUSMER, P.C.

_____
MARK J. ZAUSMER (P 31721)
Attorney for Plaintiff
32255 Northwestern Highway, Suite 225
Farmington Hills, MI  48334
(248) 851-4111

Dated:  August 11, 2021

---

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing instrument was served upon all parties to the above cause to each of the attorneys of record herein at their respective addresses as directed on the pleadings on August 11, 2021 by:

☒ E-FILE        ☐ US MAIL        ☐ HAND DELIVERY        ☐ UPS
☐ FEDERAL EXPRESS        ☐ OTHER

Brenda Ann Smith

---

Zausmer, P.C.
32255 Northwestern Highway, Suite 225, Farmington Hills, MI 48334-1574

Document received by the MI-Macomb-16th Circuit Court.

| STATE OF MICHIGAN COUNTY OF MACOMB CIRCUIT COURT | REQUEST FOR HEARING ON A MOTION NOTICE OF HEARING PROOF OF SERVICE | Circuit Court No: 21-002454-CB |
|---|---|---|
| Plaintiff Name: Joseph Craparotta | v | Defendant Name: Salvatore A. Craparotta, et al |

1. Motion(s): Motion for Early Scheduling Conference

2. Relief sought: **Expedited Scheduling Order**

3. Moving Party: **Plaintiff**

   Attorney for moving party: Mark J. Zausmer                                    (P 31721)

   Phone Number of Attorney/Moving Party: (248) 851-4111

4. Responding parties/attorneys (include Bar No.(s))

   Thomas M. Schehr                     (P 54391)                              (P        )

   Andrew J. Kolozsvary                 (P 68885)                              (P        )

                                        (P        )                            (P        )

5. ☐ I certify that I made personal contact with the individual(s) listed below requesting concurrence in the relief sought but it was denied:

   ☒ I certify that I made reasonable and diligent efforts to contact the individual(s) listed below but was unable to do so:

   _____                08/10/21
   Individual(s) contacted                Date(s)

6. **NOTICE OF HEARING:**   The above motion(s) will be heard as follows:

| Judge Richard L. Caretti | Date ~~08/23/21~~ 8/30/21 | Time ~~9:00 a.m.~~ 10:00 AM |
|---|---|---|

   **Please note:** Per LCR 2.119 and MCR 2.116(G)(1)(c) and MCR 2.119(A)(2), a copy of a motion or response must be provided to the <u>office</u> of the judge hearing the motion! Judge's copy must be clearly marked "JUDGE'S COPY."

   _____                08/11/21
   Signature of moving attorney or party   Date

| ☐ Motion Fee Paid   **FOR COURT USE ONLY** |
|---|
| Adj to: _____   ☐ THIS MOTION IS REFERRED TO A FRIEND OF THE COURT REFEREE |

7. **PROOF OF SERVICE:**

I certify that I mailed a copy of this document and the motion(s) referred to in paragraph 1 to the attorneys or parties of record by ordinary mail addressed to their last known addresses. I declare that the statements above are true to the best of my information, knowledge and belief.

_____                08/11/21
Signature of person serving document    Date

(2/24/05)